## VACHEL B. TODD *vs.* SAMUEL E. GROVE and RUTH GROVE, his Wife, Adm'x of BENJAMIN TODD.

### *Confidential Relation — Undue Influence — Gifts.*

A gift obtained by any person standing in a confidential relation to the donor, is *prima facie* void, and the burden is thrown on the donee to establish to the satisfaction of the Court, that it was the free, voluntary, unbiassed act of the donor; a Court of Equity on grounds of public policy, watches such transactions with a jealous scrutiny, and to set them aside, it is not necessary to aver or prove actual fraud, or that there was such a degree of infirmity or imbecility of mind in the donor as amounts to legal incapacity to make a will or execute a valid deed or contract.

B, an aged man, blind and crippled, being possessed of considerable real estate and a very large personal property, invited his brother V, then living in Illinois, to come and live with him and take charge of his business. V thereupon sold out his personal effects in Illinois, and with his wife and daughter came to Maryland, in October, 1866, and took up his residence in the same house with his brother, and had the whole care and custody of his large real and personal estate, and acted as his agent in the transaction of all his business from that time until his death which occurred in December following. Whilst this relation subsisted between them, in the early part of December, gifts and transfers of private securities and United States bonds to the amount of nearly $50,000, were made by B to his brother. The donor had at the time two other brothers, a wife and numerous nephews and nieces living, as also grand-children, off-spring of a deceased natural son, who had lived in the house with him. At the date of the gifts, the physical health of the donor was greatly impaired and his mind weakened to such an extent at least, as to make it more easily the subject of influence and less able to resist importunity. It was also shown that the donee, before coming and while making his preparations to come to Maryland, had deliberately formed the purpose to acquire and exert an influence over his brother for his own advantage and that of the other heirs, to the prejudice of the wife. On a bill filed by the widow and administratrix of the donor, for the purpose of vacating and annulling the gifts and transfers made to his brother, it was HELD:

That the influence which the donee possessed, from the relation in which he stood to his brother was unduly exercised for his own advantage, and the gifts and transfers made to him were invalid and could not be permitted to stand.

Todd *vs.* Grove, &c.

APPEAL from the Circuit Court for Howard County.

The bill of complaint in this case was filed on the 6th of August, 1867, by the appellees for the purpose of vacating and annulling certain transfers and gifts of private securities, and United States seven-thirty and five-twenty bonds to the amount of nearly $50,000, made in December, 1866, by Benjamin Todd, the deceased husband of the appellee, Ruth, to his brother, the appellant. The bill was filed in behalf of the widow in her own right, and as representing in her character as administratrix, the distributees and next of kin of the deceased. Its material allegations together with a very complete analysis of the facts of the case, will be found in the following opinion of the Circuit Court: The material allegations of the bill are, that the defendant abandoned his residence in Illinois and came to Carroll county, for the purpose, then declared by him, of obtaining from his brother a large proportion of his property in case of his death, his brother being then in a wretched state of health; that the defendant accordingly fixed his residence in Carroll county with his brother, and then proceeded, by the assiduous use of artifice and undue influence, continued up to the time of his brother's death, to work upon his mind, then greatly impaired and weakened by sickness, to procure from him such a disposition of his property during his life, as would at his death defeat his widow's right of dower and interest in his personal estate, and also defeat the legal rights of his other representatives and distributees; that the said Benjamin became weaker in body and mind from day to day as his life drew near to its close, until the autumn of 1866, when his condition was such that he was no longer able to resist the persistent and fraudulent arts and importunities of the defendant, and by these means the latter induced his brother to make certain conveyances of real estate, and to assign and transfer to him, without any consideration, the private securities and bonds referred to, and if these latter were not placed in his hands simply as custodian for the

benefit of the distributees, but are claimed as a gift, then that such gift was fraudulently obtained by means of such artifices and undue influence for the purpose of defeating the legal rights of the complainant, and the other legal representatives of the deceasad. The answer of the defendant, Vachel Todd, denies all fraud and undue influence, and avers that he came to Maryland at the urgent request of his brother, who was aged and blind, and was invited to take up his abode with him and attend to his business, and that in the early part of December his brother gave him these private securities and bonds in the presence of witnesses, and that this gift was his brother's free, unconstrained and voluntary act, made when he was of sound mind and perfectly aware of the transaction.

The parties being thus at issue, a mass of testimony has been taken, the case argued and submitted for decision. It is a case of great interest and importance, both as to the amount of property and the principles of law involved, and has been argued with remarkable ability by counsel on either side. To these arguments the Court is greatly indebted for a clear and comprehensive review of the law, and an elaborate and masterly analysis and application of the evidence.

In the first place, it is all important to ascertain clearly the relation in which the donor and donee stood to each other at the time these gifts were made. Benjamin, the donor, then blind, crippled and quite advanced in life, being some sixty-five or seventy years of age, married the complainant, his third wife, on the 4th of April, 1866. He was possessed of considerable real estate, and a very large personal property. He never had any children by his several wives, but had a natural and acknowledged son, Jesse Todd, who was married, had children, lived with him, and attended to all his business for him. To this son and to his children, he appears to have been much attached. He had three brothers, two of whom, Charles and Vachel, resided in Illinois, where they had lived for many years, and the other, Samuel, in Frederick county.

He had also numerous nephews and nieces, children of a deceased brother, and of two deceased sisters. In the summer of 1866, his son, Jesse, became sick with consumption, unable to attend longer to his affairs, and was evidently fast approaching the grave; it, therefore, became necessary for him to seek some one else to aid him in his business affairs, and to attend to the management of his property. It appears he first asked his brother Charles, then on a visit to him, and then applied to a nephew, James H. Brown, the only son of a deceased sister, both of whom declined. He then, on the 13th of August, through his wife, wrote a letter, which was mailed the 11th of September, to his brother Vachel in Illinois, requesting him to arrange his business out there, and come in and live with him in his house, and to attend to his business for him. The defendant thereupon sold out his personal effects in Illinois, and, with his wife and daughter, came to Maryland early in October, took up his residence in the same house with his brother, and, according to the averment in the answer, which is abundantly supported by the proof in the case, had the *whole care and custody* of all his brother's large, real and personal estate, and acted as his *agent* in *the transaction of all his business*, from that time until his death, which occurred on the 31st of December following. Whilst this relation subsisted between them, in the early part of December, the gifts and transfers in question were made; that of the private securities on the 5th, and that of the bonds some few days or a short time thereafter.

The relation, therefore, of principal and agent, in reference to its extent and character, the agency extending to the transaction of all the business and the management of all the affairs of the principal, is precisely such as existed in *Brooke vs. Berry*, 2 *Gill*, 83, and to which the Court in that case applied the law as laid down in *Story's Eq.*, sec. 315, that it is for the common security of all mankind, that gifts procured by agents, and purchases made by them from their principals, should be scrutinized with a close and vigilant suspicion; and

indeed, considering the abuses which may attend any dealings of this sort between principals and agents, a doubt has been expressed, whether it would not have been wiser for the law, in all cases, to have prohibited them; but be this as it may, it is very certain agents are not permitted, by abusing their confidence, to acquire unreasonable gifts or advantages from, nor can they deal validly with their principals in any cases, except where there is the most entire good faith and a full disclosure of all facts and circumstances, and an absence of undue influence, advantage or imposition; and this is the law when the mind of the principal is free from all imputation of imbecility. The case of the defendant is, therefore, clearly within the rules and principles of equity which govern transactions between parties standing to each other in a confidential relation.

The next inquiry is, to what extent have these principles been carried, and what are the proper limits of their application? Upon this point a large number of authorities have been cited in argument, and to review, though we have examined all of them, would here be impracticable if not a useless labor. Most of them are collected in the notes to *Huguenin vs. Baseley,* 2 *Lead. Cases in Equity,* 54 to 75, and in 1 *Story's Eq.,* secs. 307 to 323, will be found a very able and complete statement of the law by Judge STORY, as it stood when that work was written. Our attention has been called to some recent English cases of high authority, not found in either of the above references, and they have laid down a rule which would relieve this case of all difficulty, if adopted and followed. In *Rhodes vs. Bate,* 1 *Chancery Appeals,* 256, decided in 1866, the opinion of the Court was delivered by Sir G. J. TURNER and concurred in by Sir Knight BRUCE, in which the learned Judge says: "I take it to be a well-established principle of this Court, that persons standing in a confidential relation towards others, cannot entitle themselves to hold benefits which those others may have conferred upon them, unless they can show to the satisfaction of the Court, that the

persons by whom the benefits have been conferred, had *competent and independent advice* in conferring them. This, in my opinion, is a settled general principle of the Court, and I do not think that either the age, or *capacity* of the person conferring the benefit, affects this principle. Age and capacity are considerations which may be of great importance in cases in which the principle does not apply; but I think they are but of little, if any, importance in cases to which the principle is applicable. They may afford a sufficient protection in ordinary cases, but they can afford but little protection in cases of influence founded upon confidence. And, as to the nature of the benefit, the injury to the party by whom the benefit is conferred, cannot depend upon its nature. This general principle, however, must, as it seems to me, admit of some limitation. It cannot, I think, reasonably be said that a mere trifling gift to a person standing in a confidential relation, or a mere trifling liability incurred in favor of such a person, ought to stand in the same position as a gift of a man's whole property, or a liability involving it, would stand in. To carry the principle to this extent would, I think, interfere too much with the rights of property and disposition, and would be repugnant to the feelings and practice of mankind. In these cases, therefore, of mere trifling benefits, I think this Court would not interfere to set them aside upon the mere fact of the proof of a confidential relation, and the absence of proof of competent and independent advice. In such cases, the Court, before it would undo the benefit conferred, would, I think, require some further proof—proof not merely of influence derived from the relation, but of *malafides* or of undue or unfair exercise of the influence."

This rule of competent and independent advice, is supposed to have received the sanction of Lord CRANWORTH, in *Smith vs. Kay*, 7 *House of Lords' Cases*, 772, and to have met the approval of Sir JOHN LEACH, in the earlier case of *Griffiths vs. Robbins*, 3 *Madd.*, 191, 192, and to have been sanctioned by Sir J. ROMILLY, in *Cooke vs. Lamotte*, 15 *Beav.*,

239, where he said, "the rule is where these relations exist, by means of which a person is able to exercise a dominion over another, the Court will annul the transaction under which a person possessing that power takes a benefit, unless he can show that the transaction was a *righteous one.*" There is no proof to bring the case of the defendant within this rule, but without expressing any decided opinion as to its correctness, we yet think it would operate too great a restraint upon the disposition of property, to make almost every gift to a person holding a confidential relation void, merely because not made with the aid of competent and independent advice; we, however, fully assent to what is said by the Vice-Chancellor in *Billage vs. Southee,* 9 *Hare,* 540, that "no part of the jurisdiction of the Court is more useful than that which it exercises in watching and controling transactions between persons standing in a relation of confidence to each other; and in my opinion this part of the jurisdiction of the Court cannot be too freely applied, either as to the persons between whom, or the circumstances in which it is applied. The jurisdiction is founded on the principle of correcting abuses of confidence, and I shall have no hesitation in saying it ought to be applied, whatever may be the nature of the confidence reposed, or the relation of the parties between whom it has subsisted. I take the principle to be one of universal application, and the cases in which the jurisdiction has been exercised—those of trustee and *cestui que trust*—guardian and ward—attorney and client—surgeon and patient—to be merely instances of the application of the principle." "And where a gift is set up between parties, standing in a confidential relation, the *onus* of establishing it by proof, rests upon the party who has received the gift." But even if this be regarded as too broad a statement of the extent and application of the jurisdiction, it is yet very certain we are bound by the exposition of the doctrine, given by Judge STORY, in the sections of his work on Equity Jurisprudence, which we have cited, because these have been

adopted and approved by the Court of Appeals in *Brooke vs. Berry,* and in *Highberger vs. Stiffler,* 21 *Md.,* 338, and by the Supreme Court in *Taylor vs. Taylor,* 8 *How.,* 183. From the doctrines announced by these authorities, it is plainly deducible, as well as positively decided, that a gift obtained where such relation exists, as we have shown did exist between the parties in this case, is *prima facie* void, and *the burden is on the donee* to establish to the full satisfaction of the Court, that it was the free, voluntary, unbiassed act of the donor; that a Court of Equity, on grounds of public policy, watches such transactions with a jealous scrutiny, and to set them aside it is not necessary to aver or prove actual fraud, or that there was such a degree of infirmity or imbecility of mind in the donor, as amounts to legal incapacity to execute a will or a valid deed or contract. In fact, so strong is the bearing of these principles and authorities on this case, that the counsel for the defendant have admitted the transaction in question is *prima facie* impeachable in equity, and the burthen of proof is on him to sustain it. They have said they are willing to accept the doctrine as laid down in *Gibson vs. Russell,* 2 *Younge & Collier,* 115, that it is incumbent on the defendant to show that when the gifts were made, the donor was of sound mind, in all material respects competent to the transactions of such business, that he well understood the matter, and needed no other advice or assistance respecting it than such as he had.

With this statement of the rules and principles of equity applicable to the case, it becomes necessary to examine the testimony, to ascertain whether this *onus* has been fully discharged by the defendant, whether, after a careful examination and vigilant, jealous scrutiny of all the circumstances attending the transaction, the situation of the parties and the character of the gifts, it is established, to the full satisfaction of the Court, that they were the free, unbiassed acts of the donor. We have given to the testimony and proofs before us a most patient and careful investigation, and bestowed upon

them, and the arguments of counsel, the best consideration of which we are capable, and have reached the conclusion, these transactions ought not to be permitted to stand. It is of course impossible, without protracting this opinion to a wearisome length, to review in detail all the mass of proof in the case, and comment upon each circumstance, and the testimony of each witness which have contributed to the formation of our judgment. We can only state, under some general heads, the facts which we regard the testimony as establishing, and the impressions they have made on our minds.

1st. The gift was excessive in amount, clearly so in view of any services rendered by the donee, and inequitable and unjust to the other distributees, in view of any claim which the proof shows the donee could reasonably have had to the affection and bounty of the donor. It amounted to full *three-fourths* of all the property, real and personal he then possessed. The defendant had resided in Illinois, a distant State, for the last sixteen years, and it does not appear there had been any special, friendly intimacy or intercourse between him and his brother during that period. It is proved he visited him but once during that time, and that Benjamin said, Vachel never came to see him, except when he wanted money. The deceased had loaned him the small sum of $700, and had *taken a mortgage on* his lands for security, and this was also made a subject of release and gift in the transactions of December, 1866. After the sickness of his son, Jesse, his mind did not turn at once to Vachel for assistance, as the one nearest, most devoted and most likely to give willing aid. He applied to others who declined, and only after consultation and advice did he write for Vachel. There is moreover some proof that the defendant, on hearing of his brother's large property and situation, himself first wrote, offering his services for some small compensation, and consulted as to what he ought to charge therefor. There is nothing to show any estrangement between the deceased and his nephews and nieces, or that any

of them were unworthy objects of his bounty. As to his other brothers, there may have existed good reasons why he did not wish Samuel to act as his agent and take charge of his affairs, but none why he should wholly cut either of them off. Indeed, in his will, executed in 1864, before his marriage, and when his son was alive and well, he had given legacies to all of them, as well as to his nephews and nieces.

We look in vain for any reasonable ground upon which Vachel, before he came to Maryland, in October, 1866, could have based an expectation of more than a brother's share of Benjamin's estate. One witness testifies that once, about the last of September, he heard Benjamin say he had sent for Vachel to come in and attend to his business, and that he intended to give him the bulk of his fortune; that Jesse would not live long, and then a brother comes next. On the other hand, it is proved he made repeated declarations in the summer, that he intended to give $50,000 to his wife. And at a later date and after the arrival of Vachel, he said he would not divide his property while he lived, that he intended to provide for his wife, and then his brothers *might all fare alike.*

2d. As to the mental capacity of the donor at the time, it is clearly enough proved that in the prime of his years and health, he was a man of strong will, capable, quick and of vigorous intellect; and it cannot, we think, be said he had not at the time of these transactions, sufficient capacity to have made a will or executed a valid deed or contract. But the question here is not about mere legal capacity, for all the authorities under this head of equity assume its existence. If we were deciding the question of capacity on *caveat* to his will, or in case of a gift to a stranger, where the *onus* is on the party assailing the act, and capacity was the only matter we had to determine, we should pronounce in favor of the will or gift. But such is not the question now before us. The *onus* is entirely on the other side. And the state of mind, whether such as capable of being influenced by a person standing in a confidential relation and having the oppor-

tunity to exercise influence or abuse confidence, is the subject of inquiry.

On this point the proof is clear that the donor's physical health was greatly impaired. All the witnesses, even those to the transactions in question, speak of and admit this. His health commenced to fail from about the 12th of September, and grew worse from that time until his death. In the latter part of November, and especially in December, he was, as several witnesses state, constantly complaining, seemed to be in trouble, would frequently sit wringing his hands, was drowsy, hard to be aroused, and would sometimes fail to recognize relatives who called to see him. It is not clearly stated what was the nature of his disease, though two of the witnesses speak of his having had a shock of paralysis, but he was evidently then, early in December, rapidly sinking, and perhaps himself contemplating approaching dissolution. No one can tell what effect such a state of health may produce, even upon the strongest minds. In some instances, a long life of bodily weakness only serves to develop more clearly the strength of the mental faculties; in others men of strong minds and robust health when suddenly assailed by disease, lose their power of will and vigor of intellect, just in proportion as failing health weakens the body. In this case we think it evident, notwithstanding the testimony of the physicians and others who saw him occasionly, his mind had become impaired to such an extent at least as to make it less able to resist, and the more easy subject of influence and importunity. This we shall show more fully as we consider,

3d. The acts and conduct of the defendant in reference to the question of the actual exercise or not of undue influence to obtain this large amount of money and property. We have shown he had it in his power to exercise unduly and for his own advantage the influence he possessed arising from the position of confidence in which he stood to the donor, and whether he so exercised it no one knew better than himself. As was most pertinently said by Lord BROUGHAM, in *Hunter*

*vs. Atkins*, 3 *Myl. & Keene*, 141, " All men have the interpreter of the rule within their own breasts; they know the extent of their influence, and are *conscious* whether or not they have taken advantage of it in a way in which they would feel indignant that others similarly circumstanced should do with regard to themselves. The circumstances of each case, therefore, are to be carefully examined and weighed, the general rule being of a kind necessarily so little capable of exact definition; and on the result of the inquiry we are to say, has or has not an undue influence been exerted—an undue advantage taken?"

The acts, conduct and declarations of the defendant are, therefore, of the utmost consequence in determining this important question. Upon this subject what does the proof disclose? Before coming and while making his preparations to come to Maryland, the defendant held frequent conversations with his brother Charles, who had recently returned from a visit to Maryland, concerning Benjamin's wealth, and Charles advised him not to interfere with the old gentleman and his young wife, to which Vachel replied, he would not, but he would *watch her very closely,* and if he had *any influence at all* over the old gentleman, he would make it *all right* with the balance of the heirs. In these conversations Charles says he always remarked that Benjamin was so hard a man to get money from, that it would be hard for him (Vachel) to get any thing for himself and the balance of his brothers and the children, to which Vachel replied, "*if you let water drop on a stone drop by drop, it will make a hole.*" This uncontradicted testimony, without adverting to more of a similar character which is disputed, clearly shows a deliberately formed purpose on the part of the defendant to acquire and exert an influence over his brother for his own advantage and that of the other heirs, to the prejudice of the wife, and he expected to accomplish his purpose by the slow process of constant attrition. At the time he had every reason to suppose it would be the work of years. The letter inviting him in, informed him his brother's health was good, and in the ordinary course of hu-

man life, he had still years of life before him. When the defendant reached Maryland, however, he found his brother greatly changed both in health and mind; to use his own language, " he didn't seem like the same person ; " and he immediately set about the accomplishment of his purposes. The declaration of Benjamin, shortly after Vachel's arrival, " they want to persuade me to divide my property, but I'm not going to do it while I live, I mean to provide for Ruthy, and then my brothers may all fare alike," shows the work was then begun, but stoutly resisted. A week later Vachel had counted his brother's Government Bonds, and was much surprised at the amount, over $34,000. In the latter part of November Benjamin is heard to say, " they want me to do things I don't want to do, and don't intend to do, I mean to keep what I've got while I live."

No one can read this and other testimony to the same effect, without conviction, that influence had been exerted, importunity used, and proposals made, which in health and vigor of mind, the deceased would have spurned with indignation. It shows assiduous, persistent and constant endeavor, a struggling resistance, but at last a yielding will; and on the 5th of December the transfer of the private securities is accomplished in the presence of one witness, *in the absence of the wife,* the defendant being an active helper in the transaction. In a few days an order was obtained for the Government bonds, then in a Baltimore Bank, and the defendant proceeds at once to obtain them, brings them up into the country, and they are given, in the presence of two witnesses sent for by Vachel, and *also in the absence of the wife,* who had been sent to Baltimore upon an errand, which was laughed at at the time. This sending of the wife away, and the anxiety manifested by Vachel to conceal the transactions from her, clearly evince his own knowledge of the power and influence he could exert over his brother in her absence, and his fears that that influence might be counteracted by her presence, or the influence she could exert over her husband. The defendant's own

declarations, made about this time to others out of the family, as to his brother's health and inability to transact business, also show his appreciation of his failing faculties. After this, the declaration made by Vachel to Brown, that he would get his brother to deed the farm, or assign over other notes and mortgages to him, (Brown,) if he *could be rallied,* demonstrates still further the influence he knew he possessed, and could exert over the then more feeble mind, as well as a desire to prevent complaint on the part of one entitled to a share of the estate in case of death, about what had already been done for himself. One other act the defendant thought necessary to be done. On the 26th of December, he obtained an order for his brother's will, which is brought home and destroyed in the brother's presence, and with his apparent approval, and then, on the 31st, death ensues.

But by far the most important facts bearing on the inquiry now being pursued, occur subsequently. Shortly after the death of her husband, the widow having obtained letters of administration, filed her bill, and obtained a writ of *ne exeat* against the defendant, *which he evaded by fleeing from the State.* His endeavor to avoid the sheriff, and his exclamation to his brother Samuel, "You've ruined me, you've ruined me! why did you tell Ruth about them coupons?" and all the circumstances of his flight, are anything but the words and acts of conscious innocence and rectitude. It is vain to attempt any explanation of them. They are utterly inconsistent with upright and straight-forward purposes and conduct. They bespeak consciousness of having trod in crooked paths, fear of detection and exposure, and haste to secure the fruits of evil deeds. He was obliged to leave the private securities here, because they must be collected in the Maryland Courts, but the Government bonds he had in his pocket, and took with him in his flight, and when he reached home, the triumphant and sneering remark to his brother Charles, "I've got the money in my pocket, and mean to keep it," is in perfect accord with, and reflects light upon the whole line of conduct

he had previously pursued.   There are other circumstances and portions of testimony upon which it is needless to dwell, all strengthening the same influence.   But these facts, thus imperfectly stated, in our judgment, outweigh the proof of the attesting witnesses to the gifts, all the formalities of the transactions, and the apparent assent and satisfaction of the donor. They point irresistibly to the conclusion, that the influence the defendant possessed, from the relation in which he stood to his brother, was unduly exercised for his own advantage, and we believe it to have been thus exerted, and so believing and adjudging, the transaction becomes one of that sort, which, as said by Lórd HARDWICKE, in *Wells vs. Middleton,* 1 *Cox,* 118, it is not "possible for a Court of Equity, consistent with its rules and principles, and the land-marks of its authority for ages together, to admit of standing."

The marriage, the character and conduct of the wife, the feelings of her husband towards her, and the relations friendly or otherwise existing between them, have been prominently relied on as having a controlling influence upon the questions at issue.   This part of the case we touch with reluctance, not on account of the importance with which it is to be viewed in reaching a conclusion, but from the nature of the facts and circumstances disclosed, and the proofs by which they are supposed to be sustained.   But it is our duty to notice it, and we shall do so.   The argument for the defendant, in short, is this, that the marriage was entirely mercenary on the part of the wife; that her character for chastity was bad; that she communicated to her husband a venereal disease; was unfaithful to him after marriage, and otherwise treated him badly; and that the controlling motive on his part was to dispose of his property, as he had a right to do during his life, so that she should never receive any part of it.   This argument would certainly be strong if there was satisfactory foundation for it in evidence.

It is no doubt proved, the marriage did not originate in affection on the part of the complainant, resulting from that

intimacy and acquaintance usually preceding an engagement to marry. She wrote two letters to a female friend, which have been produced in evidence by the husband of the latter. These letters evince neither literary culture nor maidenly delicacy nor refinement of sentiment. In the most important of the two, she, with much bad grammar and worse spelling, bluntly avows her determination to marry old Mr. Todd, because she had heard he had offered a large sum for a wife, and requests aid in obtaining an interview with him. The other is unimportant, except as declaring her determination to carry out her purpose. It may, perhaps, be said in excuse, they were written to a friend and a married woman. It may also be remarked, that not unfrequently marriages are contracted merely for money and a settlement, and the parties still live irreproachable and measurably happy married lives; but it is not often, we hope, the determination to do so, has been so frankly and bluntly announced *in writing* by a woman as in this case. But the same witness who produced the letter testifies that he *read it* to the future husband before he met the complainant, and *he was much pleased with it.* This removes the force of all unfavorable inference, so far as the questions before us are concerned; for whatever may be said of her want of delicacy, he is equally open to the same charge. He was not a *bona fide* purchaser *without notice,* but having full notice, was gratified and content. There could, therefore, be no after-discovery of her conduct in this particular, to influence his feelings towards or treatment of her. As to the disease communicated to the husband, and for which they were both treated some few weeks after the marriage, the testimony of the physicians, and especially of Dr. Riggs, leaves it in doubt whether it was the venereal disease, or a disease originating in natural causes, to which no blame is imputable. It was proved she was the daughter of respectable parents, and had always borne a good reputation in the neighborhood where she was raised and lived. But, whatever impression may have at one time been made on the mind

of the husband from this cause, it is clearly shown to have been entirely removed, for during the whole summer and fall he is proved to have treated. her with affection and kindness. There is no proof the husband ever heard of the story of the act of adultery, testified to by Prior, and it could not, therefore, have had any influence on his mind. Apart from these proofs, which we have thus disposed of, there is no evidence worthy of notice, the husband was otherwise than kind and affectionate, or that the conduct of the wife was other than it should be. We can discover nothing in any of the testimony on this subject to aid the defendant's case.

In accordance with the foregoing opinion, the Court passed a decree on the 12th of July, 1869, declaring void and setting aside the gift of notes, single bills, mortgages and evidences of debt, together with the five-twenty and seven-thirty bonds of the United States, made by the intestate, Benjamin, to the defendant, making perpetual an injunction previously issued against the defendant, enjoining him from selling any of said bonds, notes and evidences of debt, from assigning any debts secured by mortgage, and from proceeding to recover the debt due upon any of said promissory notes or sealed bills, mortgages or other evidences of debt, and from receiving any part of said debts so due; and providing for an account.

From this decree the present appeal was taken.

The cause was argued before BARTOL, C. J., STEWART, BRENT, MAULSBY, GRASON and ROBINSON, J.

*Charles W. Ross, William A. Fisher* and *Charles Marshall,* for the appellant.

Of late years a theory has been started in some of the English Courts, that whenever a relation of confidence exists, the gift shall not be supported unless the donee can establish that the donor had competent and independent advice, no matter what may be the age or capacity of the donor; but this doctrine has never obtained a foothold in this country. In the

two cases in this State in which gifts have been assailed upon the ground of the existence of confidential relations, coupled with weakness in the donor and importunity from the donee, such a doctrine was not even alluded to. *Brooke vs. Berry,* 2 *Gill,* 83; *Highberger vs. Stiffler,* 21 *Md.,* 338. It was not even alluded to by the Supreme Court of the United States in a case in which the principle, had it been a sound one, might well have been involved. *Taylor vs. Taylor,* 8 *How.,* 183. Judge STORY, who has elaborated with great care and minuteness the rules applicable to the relationships of confidence, does not adopt it. In England the proposition may be called a novelty, which has not met the approbation of those Judges to whom we have been most accustomed to look as authority. Such a rule would be a very dangerous one, and might readily be made the means of collusion and fraud. *Hunter vs. Atkins,* 3 *Mylne & Keene,* 141.

But there has been a compliance in this case, even with the spirit of a rule so strict. Both gifts were made in the presence of intelligent and competent witnesses and advisers, and the gift of the United States bonds was made, with the assistance of the physician residing in the village, who had been the medical adviser and friend of Benjamin Todd.

The true test is to be sought in no arbitrary rule, but in a fair and just examination of the circumstances of each transaction. It is conceded that whenever the donee occupies any confidential relation towards the donor, the burden of proof lies upon him to establish the *bona fides* of the gift, but this burden is, in the case of certain species of relations, a heavy weight, while in others it sits lightly. There are certain well known relations, as those of guardian and ward, trustee and *cestui que trust,* &c., in which more proof will be required than in cases of a less defined and close character. *Hunter vs. Atkins,* 3 *Mylne & Keene,* 141.

The principle which has been established is merely that the party assailing the deed need not *show* fraud, imposition or weakness in the first instance, as he would have been com-

pelled to do had no confidential relations existed between the donor and donee, and the donee must show that no improper advantage has been taken by him of his position, and that the act of the donor was of his free bounty. But, while the burden is thus shifted, and the donee is compelled to assume the position of proving a negative, he is to present no other or higher proof than is required in any other case. *Cramer vs. Crumbaugh*, 3 *Md.*, 499, 503, 504.

Although confidential relations may have existed, yet, if the donee is the friend or near relative, the force of the rule is much weakened. *Harris vs. Tremenheere*, 15 *Vesey*, 34; *Casborne vs. Barsham*, 2 *Beavan*, 76; *Gibson vs. Russell*, 2 *Younge & Collyer*, 115.

Much less suspicion should attach to a gift than a sale from the principal to an agent. In the former case there is not the same opportunity for imposition — the principal knows that he is making a gift, and the agent does not treat with one whom he should protect; but, in the case of a sale, it is obvious, from the nature of the transaction, that the principal wishes to obtain an equivalent for what he parts with, and if he does not, the vendee may fairly be treated as having imposed upon his vendor and treated with him upon terms of inequitable advantage.

In the case of a gift, where confidential relations exist, the donee may be called upon with varying degrees of strictness, to convince the Court of the absence of any undue influence or unfair advantage, but this he can be required to do only by exposing distinctly what the relations between the parties were, by showing the character of the mind and will of the donor, what were his pre-conceived intentions, and the motives which, from the situation in which he was placed, could reasonably be supposed to have influenced him.

The counsel for the appellant, accepting the burthen of proof within the limits thus defined, undertook to show, by an examination of the testimony, that the deceased was a positive, self-willed man, not likely to be influenced; that

his mind continued in a healthy state down to the time of his death; that undue influence was impossible, and that there was no evidence of the exercise of any influence by the appellant.

*William Reynolds, Jr.,* and *Thomas Donaldson,* for the appellees.

A gift obtained by any person standing in a confidential relation to the donor is *prima facie* void, and the burden is thrown upon the donee to establish affirmatively, and to the entire satisfaction of the Court, that the act proceeded from the free and unbiassed will of the donor, whether the relief be sought by the donor himself or by his legal representatives— and this is a *principle of public policy.* *Osmond vs. Fitzroy,* 3 *Peere Will,* 129; *Huguenin vs. Baseley,* 14 *Ves.,* 273, (2 *Leading Cases in Eq.,* 54 to 75;) *Dent vs. Bennett,* 4 *My. & Cr.,* 269; *Billage vs. Southee,* 9 *Hare,* 540.

In *Cooke vs. Lamotte,* 15 *Beav.,* 234, decided by Sir JOHN ROMILLY, in 1851, the principle is extended *to all cases of voluntary donations.* *Smith vs. Kay,* 7 *House of Lords' Cases,* 750.

In *Ahearn vs. Hogan, Drury,* 310, (*note to* 2 *Y. & C.,* 120,) Lord Chancellor SUGDEN applies the rule to every case "*in which one party may exercise influence over the other.*" *Harvey vs. Mount,* 8 *Beav.,* 439; *Brooke vs. Berry,* 2 *Gill,* 98; *Highberger vs. Stiffler,* 21 *Md.,* 338, 352, 353; 1 *Story's Eq., secs.* 303 to 322.

Though this principle is carried to a much greater extent in cases of the highest authority, yet *all* the authorities in Europe and in this country agree, that it applies to the case of a gift to *an agent having charge of all the donee's business at the time,* and that is exactly the present case. *Hunter vs. Atkins,* 3 *Mylne & Keene,* 113, (8 *Eng. Cond. Ch. Cases,* 316;) *Pratt vs. Barker,* 4 *Russell,* 507, *and* 1 *Sim.,* 4.

A Court of Equity watches such transactions with a jealousy almost invincible, and if, in the conflict of testimony,

there is any doubt left on the mind of the Court as to the donee's perfect fairness, or as to the donor's perfect freedom from influence, the gift will be declared void. *Hatch vs. Hatch,* 9 *Ves.,* 291.

A Court of Equity will not be satisfied of such fairness on the one part and such freedom from influence on the other, unless the donor *had competent and independent advice* in regard to the propriety of conferring the gift; and merely the presence of witnesses is not sufficient for this purpose. *Griffiths vs. Robins,* 3 *Mad.,* 191; *Welles vs. Middleton,* 1 *Cox Ch. Cases,* 112; *Gibson vs. Russell,* 2 *Y. & C.,* 104; *Rhodes vs. Bate,* 1 *Chan. Appeal Cases,* 252.

The principles stated in the authorities are entirely independent, both of *actual* fraud in the donee, and of any weakness of mind or want of clear knowledge in the donor; although the presence of either one of those ingredients would, of course, make the case so much the worse; and if actual fraud is charged in the bill, and not proved, yet the averment is sufficient for obtaining relief. *Bridgman vs. Green, Wilmot,* 70; *Brice vs. Brice,* 5 *Barb.,* 533; *Whelan vs. Whelan,* 3 *Cowen,* 537.

GRASON, J., delivered the opinion of the Court.

We have carefully examined and considered the authorities cited in the argument of this case by the counsel of the respective parties, as well as the evidence contained in the record, and have reached the same conclusion upon the facts, as also upon the law applicable to them, which was reached by the Court below.

The opinion delivered by that Court embodies such a clear and forcible exposition of the law of the case, as well as such a thorough analysis of the evidence, that we are satisfied that no additional force could be added to it by any opinion we might file in the case. We will, therefore, pass a decree affirming the decree of the Court below, for the reasons set out in the opinion of that Court.

*Decree affirmed.*

(Decided 1st July, 1870.)