# CIRCUIT COURT OF BALTIMORE CITY

Filed June 10, 1890.

## MARY WEELS
### VS.
## SARAH E. JUSTICE.

*R. T. Kimball* and *N. Winslow Williams* for plaintiff.

*C. Dodd McFarland* for defendant.

WRIGHT, J.—

This case is in some respects a remarkable one. The plaintiff, a poor, illiterate, ignorant woman, while employed in the spring of 1888 to assort waste paper, &c., in a junk shop in this city, finds among the contents of a bag of such material in a package, what the witnesses describe as two United States gold certificates. She takes them—unaware of their value—to her home, the house of the adult defendant, with whom she resides and to whom, it appears, she gives her entire earnings in return for her board and lodging. When the plaintiff reaches this home she hands the certificates to a child of said defendant, Sarah E. Justice, as she would have handed her a toy. The child soon tiring of them places them upon a table. About this time a young man, William E. Conroy, a warm admirer of the elder daughter of said Sarah E. Justice, appears upon the scene: he examines the certificates and expresses his opinion that they are not counterfeit and worthless, but that they are valuable. With the assent of the plaintiff he is intrusted with these certificates to find out their value and to exchange them for cash. He was to receive for his services, according to the plaintiff's testimony, twenty-one dollars; but according to the testimony of all the other witnesses present, namely: Sarah E. Justice, Annie, the said elder daughter, and Conroy himself, the said Conroy demanded five hundred dollars, in case he should be successful, for his services, which demand was assented to by the plaintiff. He leaves, taking with him the certificates; and the next day he exchanges them for two thousand dollars in notes, and hands this money to said defendant, Sarah E. Justice, as he supposes, for the plaintiff; he receives two hundred and fifty dollars for his services, having been induced by the said defendant to accept one-half of the sum he had previously demanded. The plaintiff is informed by the said defendant of the success of the agent, and the money is shown to her, but she never has the pleasure and satisfaction of handling it. The defendant, Sarah, claims that when she exhibited this money to the plaintiff, the latter said, "Thank God for it; for I have been praying to the Virgin Mary to find some money, so you could buy a stall with it, for I know you will never marry then." The said Sarah further says that the plaintiff said, "Nellie, take the money and buy yourself a stall," and when the plaintiff was asked by said defendant what she wanted done with the balance, she answered, "Buy us everything we need; you, me and the children." The only other witness present at the time of this conversation was the defendant, Annie Justice, who swears substantially to the same conversation. The defendant, Sarah, considers this a gift of the money, and acts accordingly; purchases a stall and disposes of the money, the plaintiff appearing to have received only a pittance from the proceeds of the certificates.

The plaintiff denies that she ever made such a gift, and files her bill in this case, and asks that the stall may be declared her property and that the defendant, Sarah, account for the money retained by her. One week before the original bill was filed, the plaintiff appears to have executed a

transfer of all her right, title and interest in said stall to the two infant defendants, daughters of said Sarah E. Justice. The existence of this paper seems not to have been known to the plaintiff's counsel when said bill was filed, as no mention is made of it and no relief asked against the said infants. On the 28th of February, 1890, the plaintiff files her amended bill, making the said infants defendants, charging that the said assignments was obtained by fraud and duress and asking that the said paper may be cancelled and declared null and void.

It is conceded by the defendant's counsel that the plaintiff's title to the said certificates was good as against every one but the rightful owner, and such I conceive to be the law (see 3 Lawson's Rights, Remedies and Practice, Section 1313 and cases cited). This being so, and no claim every having been made by any one outside of the parties to this suit, the case must be decided as between these parties on the same principles as if the property up to the time of the alleged gift had been and was the property of the plaintiff.

In the decision of the questions involved it is necessary to consider the circumstances and the relations of the parties.

The plaintiff is an illiterate and an ignorant woman, and I cannot perceive either from her actions or her evidence that she was possessed of that natural or acquired shrewdness that has been discovered in her by the defendant's counsel. From the evidence of the defendant, Sarah E. Justice, when the plaintiff came to live with her, she was in sore straits. Says Mrs. Justice in answer to the 16th cross-question, repeated, "I took her in on account that no one else would take her, and she told me she would give me what she made to help me and the children along." In answer to the 11th cross-question she says, "She didn't pay me no board at all. When she came to live with me, I was standing in the market, and she told me she would give me what she made. I had to board her, pay for her washing and ironing, and whatever she needed had to come out of that money. She didn't all the time make full weeks. Some weeks she would make three dollars; some weeks three seventy-five, I had to do for her the same as one of my children." To the 12th cross-question she says of the plaintiff, "She didn't want to board with me; she told me if I would take her to live with me she would give me what she made. * * * Of course, when she gave me her money, I reckon she supposed I was to do by her as one of my children." And to the 8th question in chief she says, "I bought her medicine with my own money. I gave her money to go to the doctor with. It's hard to say what I didn't do for her. No one would notice her or have anything to do with her."

Here, then, we have, according to the testimony of the defendant, Sarah Justice, a poor waif, with no home, looking for a place of rest, and giving up all she should be able to earn in return for this home. She thus becomes entirely dependent on the said defendant; from her alone was she to receive what should be considered by said defendant necessary for her support and maintenance; and if the plaintiff is to be believed, she was on one occasion treated with harshness because she retained from her weekly earnings a small sum with which to pay for mending her shoe, and was consequently unable to give Mrs. Justice more than two dollars on that occasion.

This poor illiterate creature is the one who is said to have made this extravagant gift, to have stripped herself of this sum so singularly acquired, and which to one in her situation meant comfort and ease, and to have voluntarily fallen back into the dependent position previously existing; and Sarah E. Justice, who was already in receipt of all the earnings of the alleged donor, is the one to whom the gift, in the first instance, is alleged to have been made. Surely, such a gift, made under such circumstances, should be most carefully scrutinized. The parties cannot be said to have dealt with each other on equal terms. The alleged donee was in the position of a superior, and the alleged donor in the position of a dependent. This home, such as it was, meant a great deal to this woman; for it she had surrendered her independence, and she doubtless would have submitted to much injustice before she would have rebelled. More than this, however, the said defendant, Sarah E. Justice, by her own testimony, shows that her influence and control over the plaintiff was overwhelming. When asked the 31st cross-question by what authority she gave $250 to Conroy, she

answers: "I took that on my own shoulders, because I knowed she would be willing, for she always was willing to whatever I'd do before she found the money and after she found it."

It appears to me that it would be difficult to describe a case that would come more fully within the principle laid down in Huguenin vs. Baseley, 2 W. and T. T. Lead. Cas. Eq., Vol. 2, part 1, star page 597 (Blackstone's Pub. Co.'s edition). On star page 621, at the beginning of the note on the case, the annotators say: "Huguenin vs. Baseley is a leading case on the very salutary jurisdiction of equity to set aside, upon the principle of general public policy, voluntary donations obtained by persons standing in some confidential, fiduciary, or other relation towards the donor, in which dominion may be exercised over him." And on page 633, it is said: "The principle upon which equity will give relief as against the persons standing in the above relations to the donor," (that is, guardian, &c.), "will, as has been before stated, be extended and applied to all the variety of relations in which dominion may be exercised by one person over another." And on page 635, "it may be laid down, that even in the absence of any special relation between the parties, where a person gains a great advantage over another by a voluntary instrument, the burden of proof is undoubtedly thrown upon the person receiving the benefit, and he is under the necessity of showing that the transaction was fair and honest."

In 2 Pomeroy's Equ. Tur., Sec. 963, it is said that this equitable principle applies to all persons who occupy a position of trust and confidence, of influence and dependence, in fact, although not perhaps in law.

In Sec. 957 the learned author says, "The principle is applied with great emphasis and rigor to gifts, whether they are simple bounties or purport to be the effects of liberality based upon antecedent favors and obligations." And see Billage vs. Southee, 9 Hare, 534, 540; Todd vs. Grove, 33 Md. 188, 191, 194.

Applying, then, the principles established by the above cited authorities to the facts shown in the pending case, I cannot doubt that "the burden of proof is undoubtedly thrown on the defendant," and that she "is under the necessity of showing that the transaction was fair and honest."

Or as said in Todd vs. Grove, supra, 195, "that a gift obtained where such relation exists is prima facie void." The testimony has not had the effect of convincing me that the "transaction was fair and honest"; and I am satisfied that the original alleged gift, even if made, as shown by the defendant's evidence, should be declared null and void, and I am strengthened in this opinion by the subsequent action on the part of the defendant, Sarah E. Justice. It will be seen that I have arrived at this conclusion without regard to the plaintiff's evidence, which flatly denies that any gift was ever made. Taking into consideration only the evidence of the defendants on that point, I hold that the transaction has in it too many elements of unfairness to justify me in sustaining it.

The defendants, however, contend that the plaintiff, some months after the date of the original transaction, disputes having arisen between the plaintiff and the defendant, Sarah E. Justice, on the subject assigned all her right and title in the stall (if any she had), to the two infant daughters of Mrs. Justice, and that this was done by way of compromise.

I feel constrained to say that I am of the opinion that it would have been much more to the credit of all concerned in the defense had this assignment not been urged as a defense to this suit. The plaintiff at the time of the alleged execution of this paper still continued to live with the defendant, Sarah Justice, and still continued to pay over her earnings to the said defendant. She had consulted counsel as to her rights in the matter in dispute; and yet after this she is induced to go to the office of Mr. McFarland, the counsel of the defendant, and there, in the presence of no other person than the said defendant and her counsel, to make her mark to a paper by which she relinquishes all her right to the stall in controversy to these two infant defendants, between one of whom and herself there existed, and had for a long time existed, an intense feeling of dislike and animosity. I say she "was induced" to go to that office, for I do not for one moment believe that she went there without being led to do so by Sarah Justice. There is indeed an appearance of a consideration in this paper, but it is only the form, without the substance. Sarah E. Justice agrees therein to nurse and provide for the

118

plaintiff in the event of her becoming sick and in the event of her death to pay her funeral expenses. The stall being no longer the property of Sarah Justice, there was no security for even the performance of these duties, and the testimony of the said Sarah clearly shows she had no other property. It is difficult for me to give this defense any serious consideration: It was urged on behalf of the defendants that this was in the nature of a confirmation or ratification of the original gift; but "whenever a confirmation would itself be subject to the same objections and disabilities as the original act, a transaction can not be confirmed and made binding. * * * If the original undue influence still remains, or if the act is simply a continuation of the former transaction * * * no act of confirmation, however formal, is effectual; the voidable nature of the transaction is unaltered"; 2 Pomeroy's Eq. Jur. 964. The original undue influence or "dominion" in my opinion is most clearly shown to exist from the character of the whole transaction. The plaintiff testifies that Mr. McFarland knew that she had consulted counsel and also that he had inquired if she would take fifty dollars, which she refused. Mr. McFarland passes by these assertions in his testimony without noticing them, although I consider them important when taking into consideration the circumstances attending the transaction. But I can give no effect to Mr. McFarland's testimony. There may be cases, it is true, where the ends of justice require that counsel should become witnesses; but I think justice also requires that where a counsel voluntarily becomes a witness he should be prepared, by the consent of his client, to submit to a proper cross-examination. Here Mr. McFarland, after stating facts that he considered important to his client's case, absolutely refuses to submit to a cross-examination, clearly relevant, on the ground that the subject inquired of was confidential professionally, and his client objected to his answering. Thus, refusing to stand a cross-examination, his testimony must be thrown out of the case. There remains then no evidence as to what took place on this occasion other than the testimony of the plaintiff and of Sarah E. Justice, and I have no hesitation in saying that from that testimony I cannot sustain the good faith and validity of that assignment. As to admissions of the plaintiff said to have been made to one or two other parties, I would say they have little effect. Even if the testimony is taken as true, the plaintiff is said to have admitted the execution of a different paper than that filed in this case; in other words, she is said to have admitted as a fact something that the very paper filed shows not to be a fact.

It only remains for me to add that these children, being mere volunteers, have no rights in the matter that should prevent relief being given to the plaintiff; Wald's Pollock Contracts, star page 547; Bish. Eq., Sec. 239; Huguenin vs. Baseley, supra; Mendenhall vs. Treadway, 44 Ind. 131, 143.

I will sign a decree for the plaintiff as prayed.