Cadwallader et al. v. West et al.

EZRA CADWALLADER *et al.*, Appellants, *v.* CATHERINE WEST *et al.*, Respondents.

1. *Contracts with old and infirm persons, where relation of trust exists, presumed to be void.*—Where one stands in relations of trust and confidence with another who is old and failing in mind, the law will presume a contract between them to have been the result of undue influence emanating from the stronger party.

2. *Deeds — Adequacy of consideration — Courts will not look into, except where inadequacy is coupled with mental imbecility.*—Courts look into the adequacy of consideration only under peculiar circumstances, as where one of the parties to a contract, at the time of its execution, was laboring under mental weakness induced by old age, sickness, or other cause. In such cases courts of equity will investigate the consideration and determine its sufficiency, and pass upon the party's mental state and condition; and if two facts concur, viz: inadequacy of consideration and mental imbecility, although the weakness of the mind does not amount to idiocy or legal incapacity, the contract or deed will be annulled at the instance of the proper party. In such cases it is not necessary to show that the party was actually misled by fraud or undue influence.

3. *Equity — Deed — Consideration — Gift.*—Equity will not permit a party to take a conveyance for a consideration, and thereafter set up the same conveyance as a gift.

4. *Conveyances — Undue influence, what — Proof of.*—In transactions connected with the transfer of property, the non-intervention of a disinterested third party or independent professional adviser, especially when the donor is, from age or weakness of disposition, likely to be imposed on, the statement of a consideration where there was none, or improvidence in the transaction, are circumstances which furnish a probable, though not always a certain, test of undue influence or fraud.

*Appeal from Second District Court.*

*Glover & Shepley*, with *D. T. Potter*, for appellants.

I. When a deed has been made by a weak person in favor of one who stood toward him in a relation of confidence, and the provisions of the deed are unreasonable or extraordinary, or the consideration is nugatory or insufficient, or when a pecuniary consideration is set forth contrary to the truth—or more strongly still, where practicing or influence has been actually used to induce the execution—the deed will be set aside. If, in such case, an advantage is gained by the grantee, undue influence is presumed. (Hill on Trust. 23, 214, 230; *id.* 226-7; 3 Wh. &

Tud. Lead. Cas. Eq. 137–9; 4 Giff. 417; Popham v. Brooke, 5 Russ. Ch. 10; Griffith v. Robins, 3 Mad. 105; Dent v. Bennett, 7 Sim. 539; Hardy v. Hardy, 11 Wheat. 103; Whelan v. Whelan, 5 Cow. 537; Brice v. Brice, 5 Barb. 533; Dunn v. Chambers, 4 Barb. 376; 2 Dev. & Bat. 241; 13 Beav. 363; 5 Blackf. 509; 2 Gill, 83; 13 Ves. 127.) It is manifest that the deeds cannot stand as contracts for valuable consideration. The consideration is wholly inadequate. An effort is consequently made to hold them up as gifts.

II. The deeds cannot stand as donations or gifts. The same legal presumption attaches in case of a gift as in that of a sale for consideration. A gift confers a pure benefit. A gift by a weak, infirm, aged person like Mr. Cadwallader to Dr. West, who was at the time his medical attendant and business agent, and who had the donor in his own house, subject to his daily influence, is presumed by the law to have been produced by fraud and undue influence. (3 Wh. & Tud. Lead. Cas. Eq. 111, 119, 144; Sears v. Shafer, 6 N. Y. 268; Brown v. Moore, 6 Yerg. 272.) That the donor is, at the time of the gift, a member of the donee's family, and residing in his house, is proof of moral duress and undue influence. (Poston v. Gillespie, 5 Jones' Eq. 264; Archer v. Hudson, 7 Beav. 558; Taylor v. Taylor, 9 How. 199; Goddard v. Carlisle, 9 Price, 169; Maitland v. Irving, 15 Tenn. 437; Espy v. Lake, 10 Hare, 262.) There is in this case the clearest proof of active and urgent efforts by Dr. West to procure the conveyances. He had great influence over Mr. Cadwallader, and he used it all, and wholly for his own advantage.

III. The deeds cannot be considered gifts because they are not set up as gifts. The pleadings state them to be contracts for full and adequate consideration. Having failed to show these facts, the defendants cannot, in the face of the pleadings, treat them as donations—free gifts without consideration. (Hildreth v. Sands, 3 Johns. Ch. 35; 2 Sch. & Lefroy, 502; Bridgman v. Green, 2 Ves. 628; Harding v. Wheaton, 2 Mason, 387.) No one shall make out a case contrary to his pleading. The deeds are not gifts. They are made for considerations set forth on their

face — inadequate and worthless considerations.    Every line of the instrument repels the idea of a gift.

IV. The presumption of the law being that in the privacy of the confidential relations existing between the parties, and the ample opportunity which Dr. West had with Mr. Cadwallader in his house — always accessible to his influence for so long a time before the conveyance — to exert at some time or other an undue influence, the burden of proof is on the defendant to prove affirmatively that no such influence was ever exerted. (Garvin v. Williams, 44 Mo. 465 ; 3 Wh. & Tud. Lead. Cas. 144.) It is in any such case next to impossible to make the negative proof which the law demands. But in this case there is no negative proof at all. That Mr. Cadwallader said he made the deeds voluntarily and freely is not negative proof ; for he was, at the time of making these statements, in the house of Dr. West and under his influence. The statements labor under the same legal presumption of undue influence as the deeds. The question is not whether he made the deeds willingly, but how his will was created, and lead in that direction. Did Dr. West previously impress his mind for making the deeds ? That is the question. A man is about to make his will, and is told falsely that his only brother is dead ; and thus unduly influenced, he gives his estate to another person. He does it freely, willingly, but the will is void for the undue and false influence which created the intention of the testator. (3 Wh. & Tud. Lead. Cas. Eq. 141, 143 ; Huguenin v. Basely, 14 Ves. 299 ; Lyon v. Howe, 6 Eq. Cas. Law, 655 ; Couts v. Acworth, 8 Eq. Cas. Law, 558 ; Lee v. Dill, 11 Abb. Pr. 219 ; Goddard v. Carlisle, 9 Price, 179 ; Grovesnor v. Sherratt, 28 Beav. 665 ; Sears v. Shafer, 6 N. Y. 268 ; Tyler v. Gardner, 35 N. Y. 595 ; Brown v. Moore, 6 Yerg. 272.) By these deeds Mr. Cadwallader, at ninety years of age, stripped himself of all his property without any provision for future support or any power of revocation. This alone is proof of fraud and undue influence. (Forshaw v. Welsby, 30 Beav. 249.) Frissel, who drew the deed of 1863, was the attorney of Dr. West, procured and brought to the house by him. Dr. West also procured the presence of the witnesses, and took care to have the grantor's

mind examined to see if he was competent to make a conveyance of his property. Here is actual practicing to get hold of the property. (Consett v. Bell, 1 Young & Coll. 578; Gibson v. Russell, 2 Young & Coll. 116; Couts v. Acworth, 8 Eq. Cas. Law, 567.) There is a legal presumption of fraud and undue influence in the relations existing between the parties and on the face of the conveyances. Besides, there is proof of actual undue influence, and not a particle of proof to the contrary. The deeds must be set aside.

*Thos. C. Fletcher, Jno. L. Thomas,* and *Abner Green,* for respondents:

I. The mere fact of the existence of the relation of medical adviser and patient is not sufficient, of itself, to raise the presumption that undue influence was exercised, and does not put the *onus* on respondent of showing the transaction to be fair, as in case of other confidential relations. (Sto. Eq. Jur., § 313; Montesquieu v. Sandys, 18 Ves. 313; Newl. Cont. 556-8; Howell v. Baker, 4 Johns. Ch. 118; Edwards v. Meyrick, 2 Hare, 60-68; Jones v. Thomas, 2 Young & Coll. 498; Gibson v. Jayes, 6 Ves. 266; 1 Sto. Eq., § 310.)

II. It is not strictly a relation of confidence, and is not so named by Fonblanque, nor by Sugden or Chitty, and Bouvier does not so treat it. (2 Sugd. Vend. 887; Chit. Cont. 294; 4 Bouv. Inst., § 3858.)

III. In adjudged cases, where it has been held that a relation of confidence existed on the part of the person who was the physician, the courts have refused to lay down any rule as to the presumption of law arising from such relation. (Billings v. Southee, 10 Eng. L. & Eq. 37; Crispell v. Dubois, 4 Barb. 393; Dent v. Bennett, 4 M. &. Craig, 296; Gibson v. Russell, 2 Young & Coll. 104; Pratt v. Barker, 1 Sim. 1; Doggett et al. v. Lane et al., 12 Mo. 215.)

IV. There is no actual fraud shown by the evidence nor attending circumstances from which the law will raise the inference of fraud, nor to corroborate such an inference. There was no suggestion of falsehood nor concealment of the truth. (1 Sto. Eq., §§ 188, 191, 204.)

V. The evidence shows. that. the transaction, in reference to the deed of January 15, 1863, was a fair one on the part of Dr. West. The consideration was a good one. (1 Bouv. Inst. 236, 239; Bunn v. Winthrop, 1 Johns. Ch. 329; 16 Johns. 189; Jackson v. King, 4 Cow. 216; Doe v. Hurd, 7 Black, 510; 9 Yerg. 418; 7 Johns. 26; Annandale v. Harris, 2 P. Wms. 432; Coney v. Stafford, Amb. 520; 19 Ind. 271; 9 Ind. 330.; Scott v. Carruth, 9 Yerg. 418; 46 Me. 154; 30 Barb. 292; 25 Me. 326; McNeilly v. Rucker, 6 Blackf. 391.)

VI. It is very clear from the evidence that the grantor, Cadwallader, was a man of extraordinarily strong mind for one of his age, and disposed of his property in accordance with long-entertained and often-expressed intention. But the court will not inquire into and gauge the measure of his intellect if it appear that he had a competency of understanding. (Willard's Eq. Jur. 196; 4 Cow. 207; 20 Wend. 226; Dean's Med. Jur. 555.). If he was legally *compos mentis* he was a disposer of his property, and his will stands instead of a reason. (1 Fonb. Eq., book 1, ch. 2, § 3; 1 Sto. Eq., § 244; Van Alst v. Hunter, 5 Johns. Ch. 148; 1 Ves. Jr. 19; Corbit v. Smith, 7 Iowa, 60; Odell v. Buck, 21 Wend. 142; 26 Wend 255; 1 Houst., Del., 269; Watkins v. Stockett, 6 Harr. & J. 435.)

VII. The deed was the pure, voluntary, well-understood act of a man of excellent judgment, sound reasoning powers, extraordinary memory and great firmness of purpose, as is overwhelmingly shown by the evidence; therefore it must stand, no matter what confidential relations Dr. West sustained to him, and no matter whether the consideration was adequate or not. (Huguenin v. Basely, 14 Ves. 273; Harrison v. Guest, 6 De G., McN. & G. 431; Hunter v. Adkins, 3 Mylne & Keen, 113.)

VIII. The grantor, Cadwallader, being without parents, wife or children, and entertaining a strong personal dislike to his collateral kin, with reasonable cause, and which Dr. West neither produced nor fomented, his *jus disponendi* being absolute, he obtained all he wanted for the land, and the court will uphold the exercise of his right of disposal under all the circumstances. Take away the right to so dispose of it, and the incentive to

accumulate is destroyed, and an old man would be precluded from purchasing the care and comforts necessary to old age with the many acres acquired by the frugality and labor of earlier life. (Stevenson v. Stevenson, 23 Penn. St. 469 ; Hadley v. Latimer. 3 Yerg. 537.)

CURRIER, Judge, delivered the opinion of the court.

This suit was brought by the heirs at law of Isaac Cadwallader, deceased, to set aside the latter's deed to the late Dr. William West, dated January 15, 1863, as also a confirmatory conveyance of a later date. As the two instruments must stand or fall together, it will not be necessary to refer particularly to the second or confirmatory deed.

As grounds for setting aside the deed of January 15, 1863, it is alleged that West procured its execution through fraud, imposition and undue influence; that the consideration was inadequate, and that Cadwallader executed it without understanding its true character and effect, having become incapacitated, as it is alleged, for the transaction of business, through the debilitating effects of physical infirmities and extreme old age. It is also alleged that West was Cadwallader's physician and medical adviser, and that, by means of this and other confidential relations, he brought about the execution of the deed.

The answer denies Cadwallader's alleged incapacity, and denies the alleged fraud and undue influence, as also the alleged inadequacy of consideration, and avers, on the contrary, that the deed was a *bona fide* conveyance, executed by Cadwallader for and upon the consideration therein recited.

In reviewing the testimony bearing upon these issues, it will be convenient to advert to the situation of the parties and their relation to each other prior to the execution of the deed.

In the early part of the year 1850, as the evidence shows, Dr. West was residing at Hillsboro, Jefferson county, Missouri, where he was doing a fair professional business, and in possession of some pecuniary means. Cadwallader was at the same time residing on his farm near Pevely, in the same county, and some miles distant from Hillsboro. He had even then passed the ordinary

limits of human life, being at that time between seventy-two and seventy-five years of age; seventy-two, according to the pleadings, but seventy-five, as the evidence tends to show. His means of support were ample. He had accumulated a respectable property, and was a bachelor. His domestic affairs were managed by colored servants, one of whom, a woman named Leno, was the mother of an illegitimate son of his. Cadwallader, as the evidence shows, was a careful, pains-taking, money-getting man, of decided firmness of character and excellent general intelligence, particularly upon industrial and financial subjects.

In view of his advanced age and general situation, he concluded in the spring of 1850 to readjust his domestic arrangements, and did so by introducing into his household new parties, and providing for his own support and nursing during his declining years. He had been acquainted with the wife of Dr. West from her girlhood, and for that reason, or from some other cause, made overtures to Dr. West to go and live with him and take a portion of the home farm. The negotiations resulted in the following arrangement: Cadwallader conveyed to West 200 acres of the home place, reserving to himself during his life the use of the land conveyed, jointly with West, and further providing that the premises should revert to him in case he survived West. In consideration of such conveyance, West undertook to provide for and comfortably take care of Cadwallader during the latter's natural life. The provision for support was inserted in the deed as the consideration for the conveyance.

In pursuance of this arrangement, Dr. and Mrs. West went to reside with Cadwallader, and from that time continued to live with and take care of him until he died, in 1864, in all things faithfully carrying out the stipulations recited in the conveyance. This deed bears date May 4, 1850. It appears that Dr. West discharged the duties assumed by him with assiduous care and fidelity, and especially that he prescribed for and nursed Cadwallader in his sickness with kindness and prompt attention.

From 1850 to 1863, Cadwallader increased in infirmities as well as years, and appears to have been much of the time under the influence of medicine. He gradually became forgetful and

childish, and required much watching and care. Through failing memory and growing weakness he was prone to neglect his prescriptions, and Dr. West, as the evidence shows, repeatedly spoke of him as requiring the watchfulness and care demanded in the nursing and oversight of children. He was subject to various physical infirmities, and became so deaf that it was difficult to communicate with him. Judge Rankin, one of the defendant's witnesses, testified that Cadwallader was so deaf that, at the time the deed of January 15, 1863, was executed, he thought it would be an "awful job" to read it to him. The evidence clearly and abundantly establishes the fact that Cadwallader was no exception to the rule that "the days of our years are three-score years and ten; and if by reason of strength they be four-score years, yet is their strength labor and sorrow."

With the decay of his physical powers the energies of his mind abated. His memory was so seriously impaired and broken down that he appeared to have forgotten that he had made any arrangements for his own support, and would seem to have executed the deed of January 15, 1863, upon the mistaken idea that he was thereby making provision for himself as well as for the negro woman. His statements were given in evidence to the effect that he looked upon Dr. West as a disinterested benefactor, and as having saved him from "starvation." It was in evidence that Cadwallader, years after the arrangement of May 4, 1850, by which he secured his own maintenance, talked about making over his remaining property to secure for himself care and support for the rest of his life. He seems to have been infatuated with the notion that he was exposed to want and suffering. According to the evidence, Cadwallader, at the time the deed in question was executed, was but the physical and mental wreck of what he had been in his mature manhood, or what he was at the time the deed of May 4, 1850, was executed, although he had even then passed his seventy-third year. In 1863 he was between eighty-five and ninety years of age. He had ceased to do business, and rarely left the house. His affairs gradually fell into the hands of Dr. West, who supervised them as his agent.

Under these circumstances it cannot be doubted that Dr. West

acquired an important if not a controlling influence over Cad-
wallader's mind and acts. They had lived together in the same
house for thirteen years, and were constantly associated together
around the same table and fireside. As occasion required, Dr.
West acted as the agent, friend and medical adviser of Cad-
wallader, and there was some evidence tending to show that he
acted to some extent as his spiritual adviser as well. Cadwalla-
der's religious views were modified; and he became increasingly
hopeful as to the realities of the future and careless of the pres-
ent life.

Dr. West won Cadwallader's confidence completely, and it is
no reproach to him that he did so. Nor is it any reproach to him
that he was kind and ingratiating in the discharge of the duties
of his trust. Nevertheless, when Dr. West came to make bar-
gains with his *quasi* ward, a feeble old man in his dotage, he
placed himself in a position of great delicacy, and one that re-
quired of him the exercise of the highest sentiments of justice and
honor. Indeed, the law is so jealous of contracts made between
parties situated in relation to each other as Dr. West was in rela-
tion to Cadwallader, that it presumes them to have been the result
of undue influence emanating from the stronger party.

With this general view of the condition and situation of the
parties and their relations to each other, I now turn to a consid-
eration of the specific contracts entered into between them during
the thirteen years above mentioned. The arrangement of May
4, 1850, has already been referred to. It was made at a time
when neither party was particularly subject to the influence of the
other, and before Cadwallader's mind and memory had become
seriously impaired. Cadwallader thereby made a careful and
judicious provision for his own comfort, happiness and future
support. The contract was quite as favorable to him as it was
to West. Their later contracts are of a different character.
There were three of them, and each successive arrangement bore
with increasing severity upon the weaker party.

The first of the three was made in April, 1856, six years after
West had assumed Cadwallader's support. It was as follows:
Cadwallader conveyed to West his life estate and reversionary

interest in the two hundred acres described in the deed of May 4, 1850; also all his joint interest in the products of the farm, including the stock, together with the following personal effects, to-wit: " A wagon and all the horses, cattle, plows, harness and farming utensils then on the farm, belonging to said Cadwallader." The consideration for this conveyance was West's agreement " to take care of and support at his residence on said farm, an aged free black woman named Leno, formerly the property of said Cadwallader, for and during Cadwallader's natural life," but the support was not to include clothing. The amount of property thus turned over for Leno's support while Cadwallader should live — and he was then about eighty — was considerable, although the evidence fails to disclose its value with distinctness. West, however, seems to have got the better of the bargain. Leno was then an " old woman," as the deed recites, but how old, or what were her prospects of life, the evidence fails to inform us. It can hardly be supposed, however, that Cadwallader acted with intelligence in contracting for her support merely while he lived, leaving her at the moment of his death destitute and wholly unprovided for.

The next business operation between these parties occurred in October, 1858, and consisted of an exchange of lands as follows: Cadwallader conveyed to West three and a half acres of valuable land near the Pevely railroad station, and West conveyed to Cadwallader as an even exchange an equal amount of land in another locality — a long, narrow strip sixty-two feet wide and more than half a mile long, a portion of it being rocky and worthless. As a business operation this transaction, so far as the facts and circumstances are disclosed in the evidence, is wholly indefensible. Of course Cadwallader was at liberty to give away his valuable lands if that was his pleasure.

We now come to the deed of January 15, 1863, which constitutes the subject of the present litigation. By it Cadwallader stripped himself of property completely, and turned everything over to Dr. West, down to and including the furniture of his chamber, and for a most palpably inadequate pecuniary consideration. The deed conveys to West all of Cadwallader's lands,

bonds, notes, and all evidences of debt, and every description of his personal property, " in consideration that the said party of the second part [West] had executed to the party of the first part [Cadwallader] his obligation to provide suitable food, clothing, house-room and necessary medical attendance for the negro woman named Leno, so long as she should live ; and for the further consideration of $100, and (also) in consideration of the kindness and assiduous care and attention given me [Cadwallader] by the said party of the second part in my late sickness." The substance of this elaborately stated consideration is this : $100 in money and the support of the old colored woman Leno for the remnant of life which might remain to her after Cadwallader's death ; for West had assumed her support under the previous contract up to that time, except her clothing. What Leno's prospects of life were in 1863 the evidence fails to show, except as it appears that she was already " old " in 1856, seven years before. So far as the evidence throws any light upon the subject, the charge of her support was not likely to be either heavy or long continued.

There has been no attempt to attach any specific pecuniary value to Dr. West's previous "care and kindness" to Cadwallader in the latter's then late sickness ; nor is it claimed that Cadwallader became pecuniarily indebted to West for such care and kindness. West was bound to take care of Cadwallader in sickness as well as in health, under the contract of May 4, 1850. In nursing Cadwallader in his sickness, West rendered a service for which he had then already been paid. The result of the matter is that the support of Leno and the $100 is all that Cadwallader got for his entire estate, real and personal.

The value of such real and personal estate the evidence fails to show with a satisfactory distinctness. Judge Rankin, who was familiar with Cadwallader's affairs, testified that he had a "great deal" of money loaned out, and counsel have admitted in the argument that the personal estate was of the value of $3,000. In those times that amount would hardly be regarded, in the language of Judge Rankin, as a *great deal*. But that sum, coupled with Rankin's valuation of the land, 372 acres, shows an estate of some $15,000. There is nothing in the evidence to indicate

that the annual cost of Leno's support would absorb more than a fractional part of the probable annual income from the property, and that at most only for a few years. The pecuniary considerations mentioned in the deed were no equivalent for the estate conveyed by it. The inadequacy of the consideration is apparent and gross.

But the deed is not necessarily to be set aside because it was executed upon an inadequate consideration. Courts do not ordinarily look into the question of the adequacy or inadequacy of a valuable consideration. That is done only under peculiar circumstances, as where one of the parties to the contract, at the time of its execution, was laboring under mental weakness induced by old age, sickness or other cause. In such cases courts of equity investigate the consideration and determine its sufficiency, and pass upon the party's mental state and condition. If two facts concur, viz: inadequacy of consideration coupled with mental imbecility, although the weakness of mind does not amount to idiocy or legal incapacity, the contract or deed will be annulled at the instance of the proper party.

The rule on this subject is thus declared: "Where there is *weakness of mind* arising from old age, sickness, intemperance or other cause, and a plain inadequacy of consideration," equity will interfere and relieve the party from the injustice of the unequal contract. That proposition was stated in Tracy v. Sacket, 1 Ohio St. 60, as expressing the result of all the authorities bearing upon the point. (3 Wh. & Tud. Lead. Cas. Eq. 138 ; Hill on Trust. 214 ; and see Buffelow v. Buffelow, 2 Dev. & Bat. 241.) It is not necessary in such cases to show that the party was actually misled by fraud or undue influence. (See authorities above.) But the presence of undue influence of course strengthens the case. Thus, it is asserted as a "general principle that the inadequacy of consideration, or the presence of hard and disadvantageous stipulations, or the mere fact that a right has been conceded without an equivalent, will be a sufficient warrant for the interference of equity, where the weakness of the complainant or the position of the defendant makes it the duty of the one to take that care of the other which the latter is unable

to take to himself, *although there may be no proof of actual fraud, or the exertion of undue influence.*" (3 Wh. & Tud. Lead. Cas. Eq. 139.)

These principles, applied to the facts of the case at bar, are fatal to the defense, so far as the defense rests upon the sufficiency of the deed as a valid and binding *contract*; whether the deed can be sustained as a gift, is another matter. The grantor was in an enfeebled and weak state of mind; his memory of recent or current events nearly gone; the consideration of the deed was inadequate, and the grantee stood in a confidential relation to the grantor — in fact, in a complication of confidential relations, as we have seen; but the grantor's weakness of mind, coupled with the inadequacy of the consideration, were, as has already been stated, sufficient of themselves to avoid the deed.

Before dismissing this branch of the case, it may be well to refer again to the opinions of Dr. West, bearing upon the question of Cadwallader's mental state. As we have seen, Dr. West described him as extremely childish, and as requiring the care bestowed upon children — that is, as being in his dotage. He not only expressed these opinions, but acted upon them. Preliminary to the execution of the deed of January 15, 1863, and as though anticipating a future contest, he had Cadwallader specially examined with reference to his capacity to execute a valid and binding contract. The fact that such an examination was had at Dr. West's instance shows at least this: that West considered there was occasion for it; that he deemed it prudent to arrange in advance for evidence to fortify the deed. The character of the examination was also significant. It was conducted by an unprofessional neighbor who does not appear to have had any particular interest in Cadwallader or his heirs, and merely elicited from Cadwallader an expression of his religious hopes and feelings. Nothing appears to have been said in relation to property or business transactions, or any merely secular interest. The examination at best was superficial, and wholly unsatisfactory as showing capacity in Cadwallader to transact important business intelligently without the aid of friendly counsel. The fact of the examination and the character of that examination tend in the opposite direction.

As a contract based on an adequate consideration, the deed must fall. Can it be sustained as a gift? Owing to the relation which the parties sustained toward each other, the deed was presumptively the result of undue influence, and therefore *prima facie* void for that reason. It has been repeatedly declared by learned chancellors that the mere relation of patient and medical adviser was sufficient to avoid the contracts of the former made with the latter during the continuance of such relation. In Dent v. Bennett, 4 Mylne & Cr. 277, Lord Cottenham said that this was "undoubtedly so;" but said his lordship, "I will not narrow the rule or run the risk of in any degree fettering the exercise of the beneficial jurisdiction of this court by any enumeration of the descriptions of persons against whom it ought to be most freely used." (See 1 Sto. Eq., § 314.) This rule "stands upon the general principles applicable to all the variety of relations in which dominion may be exercised by one person over another." It is upon this general principle that courts base their action in cases like the present, arising between parent and child, guardian and ward, principal and agent, attorney and client, patient and physician; and the principle applies with as much force to the relation of patient and medical adviser as it does to the other relations specified. In Buffelow v. Buffelow, 2 Dev. & Bat. Eq. 250, Ruffin, C. J., declares that the rule on which the court interferes between attorney and client would be a "lifeless skeleton" unless it were animated by a principle which would enable it to embrace all cases of the abuse of the like confidence. That was a case where the defendant, *who was not an attorney*, appeared before a magistrate in the interest of the other party as his friend. The court, however, applied to the case the rule which obtains between a professional attorney and his client, on the ground that the rule was based on a principle broad enough to include the particular case. That general principle has already been given, and it is comprehensive enough to embrace the case at bar. But Dr. West was not merely Cadwallader's physician, he was his agent, companion and friend as well. The two had lived together in the same house for thirteen years on terms of general intimacy and confidence. West had every opportunity of

influence and control which one man could well have over another. Added to these opportunities was the fact that Cadwallader was a feeble old man, rapidly sinking to the grave under the weight of more than four-score years, near four-score and ten. There can be no doubt that the general principle adverted to applies to the relations subsisting between Cadwallader and West.

The presumption that West exerted an undue influence over Cadwallader's mind in procuring the deed, springs out of the relations which they sustained toward each other, and is intensified by the circumstances of Cadwallader's mental and physical condition. Is that presumption repelled by the evidence? In this class of cases the " court watches the whole transaction with great jealousy, not only for the purpose of ascertaining that the person likely to be influenced fully understood the act he was performing, but also for the purpose of ascertaining that *his consent to perform the act was not obtained by reason of the influence possessed by the person receiving the benefit ;* not that the influence itself flowing from such relations is either blamed or discountenanced by the court. On the contrary, the due exercise of it is considered useful and advantageous to society. But this court holds as an indispensable condition that this influence should be exerted for the benefit of the person subject to it, and *not for the advantage of the person possessing it.* " (Houghton v. Houghton, 15 Beav. 299.) The deed, then, is not only presumptively invalid, but the whole transaction out of which it issued is to be " watched with great jealousy " in the interest of the weaker party, and so in the interest of his heirs and legal representatives. Under the guidance of this rule we are to consider the evidence.

It may be remarked in this connection that the answer does not claim that the deed was executed as a gratuity. The defense is placed upon no such ground by the pleadings. The theory of a gratuity is an afterthought. It is not the theory of the answer, nor was it the theory upon which the deed was drawn. Upon the face of the deed it purports to have been executed for and upon a valuable consideration, and the answer asserts the fact to have been so. Now it has repeatedly been held that equity will not

permit a party to take a conveyance for consideration, and there-after set up the same conveyance as a gift. Conveyances have repeatedly been set aside on that ground. (Bridgman v. Green, 2 Ves. Sr. 627; Dent v. Bennett, 4 Mylne & Cr. 273.)

Waiving, however, the conclusiveness of the point thus stated, the fact that the deed was executed as an instrument of bargain and sale, based upon consideration, and not as a deed of gift, is nevertheless not to be lost sight of in what remains to be said. Did Cadwallader intelligently execute the conveyance as a deed of gift? And if so, was it the unbiased, spontaneous act of his own mind, acting voluntarily and without solicitation on the part of West? The proof is convincing that the scheme of the deed was matured between West and Cadwallader without the intervention of third parties. There is no pretense that any one else knew of it until the day of its execution, except Frissell, the attorney who drew it up; and there is no claim that Frissell knew anything of the matter until he was called upon by West to give the subject his professional attention. He was employed by West in the name of Cadwallader, but West alone manifested any deep concern in connection with the business to be transacted. West was active and vigilant throughout. He was not only solicitous for Frissell's services, but to have them at once and without delay. The evidence leaves no doubt on this point. His anxiety proves his interest, and his hurry shows that he feared the possible result of delay. His anxiety and hurry are not explained except upon the theory that an arrangement existed between him and Cadwallader, which was of interest and importance to the former, and which West wished reduced to writing, and made secure at the earliest practicable moment. In fact, West told the defendant's witness, Mocbee, as the latter testifies, "that the old man was going to make a conveyance of his property to him and *fix up that business.*" This was before Frissell was brought in, and shows that the "business" had then already been arranged. West was at the time in pursuit of Frissell to go to Pevely and draw up the deed of January, 1863. Frissell was the only third party shown to have had any conference with Cadwallader in relation to the deed prior to its execution. For whom did he act?

What passed between him and Cadwallader the evidence fails to show. We have the results, however, in the form of a deed which stripped Cadwallader bare of property and placed everything in the hands of West. The deed shows upon the face of it that it was drawn in the interest of the grantee, and not in the interest of the grantor. Every circumstance about it points in that direction. Its labored effort to express an adequate consideration, and especially the entire absence of any provision or clause in it favorable to the grantor, indicates this. It was absolute and unconditional, and reserved to the grantor no power of revocation or modification: It took from him his entire estate, and left him a dependent upon West from that time forward, without the slightest guaranty of support, even as a consideration for the conveyance.

But Cadwallader evidently supposed he was making provision for himself as well as for the colored woman Leno. His statements before and after the execution of the deed show that. Yet the deed contained no provision on that subject. The deed upon the face of it furnishes striking evidence of incapacity or improvidence on the part of Cadwallader, and it is quite impossible to suppose that Frissell regarded himself as acting as the grantor's attorney and counselor in drawing it up. The deed contains no trace of good advice given in the interest of Cadwallader.

Cadwallader, then, executed the deed without the assistance and counsel of friendly third parties. Feeble and broken as he was, he acted alone, and that is a circumstance greatly to the prejudice of the transaction. The non-intervention of a disinterested third party or independent professional adviser, "especially when the donor is, from age or weakness of disposition, likely to be imposed upon; the statement of a consideration where there was none, or the improvidence of the transaction, furnish a probable, though not always a certain, test of undue influence or fraud." (3 Wh. & Tud. Lead. Cas. Eq., in 70 Law Lib. 60; Harvey v. Morant, 8 Beav. 439.) All these circumstances conspire to condemn the deed under consideration, and there was no important circumstance to abate or qualify their force. It is true, indeed, that the deed was not entirely without consideration; but.

the consideration, as compared with the value of the property transferred, was slight and insufficient.

Throughout the transaction West was the urgent and active party. He procured the attorney, the magistrate and the witnesses; and, in order to leave nothing undone that vigilance could suggest, he went to the extent of having, as we have seen, Cadwallader's mental soundness inquired into. All these matters are clearly established by the evidence. What occurred between the parties privately, the evidence fails to inform us. As to that we are left to inference and conjecture. West had every facility for the exertion of an undue influence over the mind of Cadwallader, and all the surrounding circumstances of action and activity on his part go to raise the inference that he did not neglect his opportunities.

But it is urged that Cadwallader was either hostile or indifferent to his relations, and that the evidence shows he had, many years before, quarreled with some of them, and that he took but little interest in others. It appeared also that he had avowed his determination to do nothing more for his kindred. This furnishes no explanation of Cadwallader's improvidence as to himself, nor does it justify or excuse the exertion of undue influence on the part of West. If Cadwallader had been left to himself and his own natural biases of mind, he might have become reconciled to his relations, as he became reconciled to West after a most violent quarrel with him. In 1856 these parties fell out, and so violent was the feud that Cadwallader challenged West to mortal combat, and West was upon the point of abandoning Cadwallader and his premises. These parties, however, changed their minds, and subsequently re-established relations of friendliness and confidence. So it might have been between Cadwallader and his relations, had no unfavorable influence intervened. However this may be, it was West's duty, in view of his confidential relations to Cadwallader, to leave him uninfluenced in the disposition of his estate; at least to forbear the exertion of influence to secure the estate to himself.

It is again insisted that Cadwallader made the deed to West from motives of gratitude to Dr. and Mrs. West, springing out

of their previous care of him in sickness. The evidence does not sustain that view. The deed was clearly intended to secure a support for Leno. That is not denied, and the possible cost of that support has been magnified in order to show adequacy of consideration, independently of the question of grateful recollections. It is, moreover, equally clear from the whole current of Cadwallader's statements, both before and after the execution of the deed, that he intended to secure to himself additional guaranties for his own support. He must have acted under a misapprehension as to the effect of the deed, for it secured to him. nothing. It left him, as to his support, in the same condition he was prior to its execution, except as the deed took from him all pecuniary means of providing for himself.

It is further insisted, as rebutting the presumption of undue influence, that Cadwallader not only avowed his gratitude to West, his aversion to his kindred and his determination to disinherit them, but that he declared his contentment with the deed after it was executed, and in fact executed a subsequent deed to ratify and confirm the first — that is, to ratify and confirm the deed of January, 1863; and these facts are shown by the evidence.

Cadwallader died in 1864, and it must be borne in mind that he was constantly growing feebler and weaker, mentally and physically, from the day the deed of January, 1863, was executed down to the day of his death. If he failed to comprehend the effect of the first deed, as he clearly did as regarded his own support at least, did he understand the second any better? If the first deed was the result of undue influence, when did that influence cease to operate? From the day the deed of 1863 was executed, for the remaining months of his life, Cadwallader was completely in the hands and subject to the influence of West. If the first deed was the result of West's active interposition and influence, but little importance can be attached to the subsequent deed or Cadwallader's subsequent declarations. If the first deed is too weak to stand alone, it cannot be supported by subsequent acts and declarations which challenge still less of confidence. (See Wh. & Tud. Lead. Cas. 102, § 3; 3 Am. Eq. Cas.)

Cadwallader consented to these transactions, but did he understand them? Was his consent the result of the influence possessed by the person receiving the benefit? The law presumes that it was, and that presumption is not removed by the evidence. The facts and circumstances which go to explain and uphold the deed of 1863, are met and balanced by other facts and circumstances of an opposite tendency. The confidential relations of the parties raising the inference of undue influence is not the only circumstance to be weighed in opposition to the deed. It shows improvidence on its face. It was executed without the intervention of disinterested third parties and without the aid of independent professional counsel. The grantor was in his second childhood, and the grantee, who was to enjoy the benefits of the deed, was persistent and active in procuring its execution, at least as regards all the external surroundings of the transaction. Were his efforts limited to these outward acts? Cadwallader was a dependent inmate of the grantee's family. What occurred, what influences were brought to bear within that circle, the evidence does not disclose. The law presumes the presence of undue influence where parties are situated in relation to each other as were the parties to the deed under consideration. In the case at bar, as already remarked, that presumption is not overcome by countervailing facts and circumstances.

The judgment of the court below must therefore be reversed and the cause remanded. The Circuit Court will proceed to take an account and to enter up its final decree in accordance with the views expressed in this opinion. The other judges concur.