GEORGE A. SCHUYLER, Adm., *c. t. a. vs.* SAMUEL H. STEPHENS.

NOVEMBER 18, 1907.

PRESENT: Douglas, C. J., Dubois, Blodgett, Johnson, and Parkhurst, JJ.

(1)　*Gifts Causa Mortis.　Confidential Relations.*

Respondent, a physician, had attended testatrix in a professional capacity until her death, which occurred at his own home, where she had been removed. He had previously entered into partnership relations with her, and had taken from her a note for $5,000 as security for the performance of her agreement. He had also acted as her agent on occasions in the transaction of her business, and, with the exception of the execution of the will, had apparently acted as her adviser.

April 11, 1904, she executed a will, drawn by an attorney in accordance with her carefully considered instructions, for the disposal of her property. After the decease of testatrix the greater portion of her personal estate was found in possession of respondent, who claimed it as a gift from testatrix, April 30, 1904, a week before her decease. Respondent claimed that testatrix put him in possession of the property by giving him a locked box which he subsequently found contained the securities which she had at the time of the execution of the will enumerated to her attorney, and a deed of gift dated April 19, 1904.

The fact of delivery of the box to respondent at the time claimed by him was disputed by the evidence, of the nurse, who claimed to have seen a box, in which deceased kept papers, in the same place where respondent claimed it was when given to him, in that place after the death of testatrix, and that the keys were under the pillow on the night she died and that respondent claimed to have taken them ,to give to the administrator. This was denied by respondent.

*Held,* that the gift, if made, was clearly a gift *causa mortis,* and therefore one requiring the clearest and most satisfactory proof, leaving no dou bt or suspicion in the mind of the court concerning the essential facts.

*Held,* further, that in this case, where the plan of the will was almost wholly defeated by the gift of substantially all of the personal estate of testatrix to respondent, in the absence of any evidence as to any change of relations or conditions between deceased and the beneficiaries, the change could not be satisfactorily accounted for.

*Held,* further, that the gift lacked the essential proof necessary to establish it under the well-settled rule.

EQUITY.  Appeal from decree of Superior Court and decree affirmed.

PARKHURST, J.  This is an appeal in equity from a decree of the Superior Court setting aside a gift of ·personal property made by Mary T. Merriss, late of Pawtucket, deceased, to the respondent, and ordering that a certain so-called deed of gift be delivered up to be cancelled and that said personal estate which was the subject of said gift be turned over to the complainant.

The record discloses the following state of facts:

Mary T. Merriss died at the house of the respondent, in Central Falls, R. I., on the 7th day of May, 1904, leaving a will which was admitted· to probate in the city of Pawtucket, R. I., June 17, 1904, and this decree of probate was subsequently affirmed on appeal.

The respondent is a physician.  He became acquainted with the testatrix Mary T. Merriss in 1893, when he attended her grandmother professionally in Barrington, Miss Merriss being the nurse in charge of the patient.  He afterward attended Miss Merriss, who was suffering from cancers, in his professional capacity from time to time, and later, by a written agreement dated February 16, 1903, entered into a contract of copartnership with her for conducting a sanatorium at

Central Falls, she giving him her note for $5,000 as security for the performance of this agreement on her part. A house was leased for five years, by the respondent, in his own name, for use as a sanatorium, and the respondent moved there with his family.

It is to be noted that the respondent admits that the articles of copartnership above referred to were written wholly by him, in his own hand; and it does not appear in testimony that Miss Merriss had any advice as to the same, or as to the giving of the $5,000 note as security, from anyone, unless it be inferred that she relied upon the advice of the respondent himself. Negotiations for the opening of the sanatorium progressed from the date of the partnership, and Miss Merriss and the respondent were frequently together in these negotiations, as well as in the relation of physician and patient.

The sanatorium was not opened as planned, on account of the illness of Miss Merriss, who continually grew worse; and the respondent continued to attend her as her physician at her rooms at Park Place, Pawtucket, and also occasionally performed various necessary services for her not ordinarily performed by an attending physician.

In February, 1904, owing to lack of proper conveniences at her home in Pawtucket, she went to the house in Central Falls where the respondent lived, and where the sanatorium was to be, and she remained there continuously under his care until her death, which occurred May 7, 1904.

On April 11, 1904, she executed her will and gave it, in a sealed envelope, to the respondent for safe keeping; he kept it in his safe-deposit box till after her death, and then gave it to the person named as executor; who presented it for probate, and declined to serve; whereupon this complainant was appointed administrator with the will annexed.

It is to be noted that the will was drawn in accordance with the specific and carefully considered instructions of Miss Merriss, by an attorney in good standing whom she specially called in for that purpose some days prior to the date of the will; that the first draft of the will was taken to her by her attorney, and was changed in several particulars after careful

consideration; that the will was then rewritten by the attorney and was executed, in form as now appears in evidence, on the 11th day of April, 1904; that in giving the instructions for the will she stated what property she had, and mentioned quite specifically the various items of stock and money in bank (which are enumerated in the bill and which were claimed subsequently by the respondent under the gift), and stated that she had carefully considered the amount of her income; and was particularly desirous of securing to her father an annuity of $600 for his life; and that after his death she desired her estate to be given as stated in the will. The will places most of her property in trust for the purpose of this annuity, and provides for the distribution of upwards of $10,000 in specific legacies after her father's death, to individuals in varying amounts (including $3,000 to the respondent), and to various charitable and religious corporations. It appears also that Miss Merriss had some undivided interests in real estate, most of which was unimproved and produced little or no income, but was subject to the payment of taxes. Just how much real estate there was, or where it was or what was its value, the record does not disclose, except in a vague and unsatisfactory way; but we are satisfied that the various stocks and moneys in bank and other personal estate which are here in controversy constituted, in the estimation of the testatrix, the substantial portion of her estate from which she expected her father's annuity, as well as the specific bequests in her will set forth, to be realized.

After the death of Miss Merriss, which occurred on the seventh day of May, 1904, and after the appointment of the complainant as administrator with the will annexed, the complainant sought to find the personal estate of the deceased testatrix; and then learned from the respondent that he had in his possession a tin box which contained the certificates of stock, bank-books, and other papers herein referred to and which respondent claimed had been given to him by Miss Merriss in April, 1904. The respondent testifies, in regard to this alleged gift, as follows, in answer to questions by his solicitor of record in this case: "Q. 120. I will ask you

whether or not at any time she made you a gift of the box
and its contents? A. She gave me this box and all of its con-
tents. Q. When? A. On the thirtieth day of April, 1904.
Q. Where was she at the time she gave it to you? A. She
was sitting in bed. Q. Where? A. In my house. Q. 801—
A. 801 Broad street, Central Falls. Q. I will ask you whether
or not the box was locked when given to you? A. It was
locked. Q. Was there any key given with it? A. No. Q.
When she gave you that box, Doctor, what did she say to
you? A. She told me to go into the closet drawer there
where the box was and to give it to her. I went in the closet,
opened the door, got the box out and she took it with both
her hands,—her hands were shaking and her voice trembling
just like this. She says, 'I am through with this life. I have
no more, no further use for this box and its contents, and you
have been more than a father to me and your wife more than
a mother to me. You have done everything that man could
do to save my life, and I give you this to use as you see fit. It
is yours forever.' · Q. The box, then, was handed to you? A.
To me. Q. What did you do with it? A. I took the box
in my own room and put it into the bureau drawer and left
it there. Q. Your room was where, Doctor? A. On the
east side of the house. Q. On the same floor with Miss Merriss?
A. On the same floor. Q. And you said you placed that in
your bureau drawer? A. I did. Q. Was the door of that
room left open? A. Yes. Q. The bureau drawer unlocked?
A. No, locked. Q. Where did that box remain, so far as
your knowledge, until after her death? A. It remained in my
bureau drawer. Q. Until after her death? A. Until after
her death. Q. Did you or not keep that box from the time
she gave it to you in your possession on the 30th day of April,
1904, until after her decease? A. I did."

The respondent further testifies that she gave him no key
to the box, that he was not able to find any key after her
death, and that he never knew what was in the box until
some two or three weeks after her death, when he caused the
box to be opened by a locksmith and then discovered in the
box the several certificates of stock, bank-books, mortgage

and note, insurance policy and other papers enumerated in the bill and in the record, together also with a paper reading as follows:

"CENTRAL FALLS, R. I., April 19, 1904.

"I hereby give grant transfer and deliver to S. H. Stephens this cash box and all its contents, it being my personal property for him to hold as his forever.

"MARY T. MERRISS."

The fact that the box and its contents and the deed of gift above recited were in the possession of the respondent at the time above stated after the death of Miss Merriss is not controverted. But the fact of the delivery by Miss Merriss to him of the box and its contents at the time (April 30th) when he says she gave them to him, or at any time before her death, is apparently disputed by Mrs. Fiske, the nurse who had the care of Miss Merriss from March 22, 1904, till her death. Mrs. Fiske testifies that a japanned tin box in which Miss Merriss kept papers, and to which she had a key, was kept in a large drawer in the closet out of Miss Merriss's room; that Mrs. Fiske frequently, by request of Miss Merriss, brought that box to her while she was in bed, and that she frequently opened it, taking out and putting in papers, unlocking and locking the box, and requesting Mrs. Fiske to put it back again in the drawer from which it was taken; that the box remained in the drawer until after Miss Merriss's death, and that Mrs. Fiske saw it there the Saturday morning Miss Merriss died and after her death; that the key of the box was kept by Miss Merriss under her pillow and was there under the pillow on Thursday night before Miss Merriss died, and after she sank into a state of coma from which she never rallied; that the key of the box was not under the pillow on the next morning (Friday) at 1:45 A. M., when she went to fix the pillows; that the respondent was then present in the room, having been sitting up with Miss Merriss from eleven P. M. on Thursday night to 1:45 A. M. on Friday, and was then engaged in looking in the drawers of a dressing-case used by Miss Merriss

and standing in her room; that she, Mrs. Fiske, spoke to the respondent, saying: "I can't find the little keys, Doctor, where are they?" and he said, "I have them. I have to give them to the administrator with the box;" that the Doctor said he was looking for a paper in the dressing-case, and, being asked by her what paper, said: "The old will."

This testimony of Mrs. Fiske (which is denied by Dr. Stephens), taken with the testimony of Dr. Stephens, comprises all that the record discloses as to the actual delivery of the box and its contents to Dr. Stephens by Miss Merriss; and, although it is somewhat vague in that it does not strictly identify the box seen and handled by Mrs. Fiske with the box in question in this suit, is yet of sufficient weight to raise a doubt in our minds as to whether the actual delivery of the box and its contents was made at the time and in the manner testified to by Dr. Stephens; or whether there was another "japanned tin box" of a similar kind in use by Miss Merriss, to which there is some vague allusion in the record, but as to which we do not find any actual testimony.

It is in evidence, also, and not disputed, that as to such money matters and matters of business as were required to be transacted on behalf of Miss Merriss while she was at Dr. Stephens's house, from February, 1904, till her death, he acted for her, drawing $1,000 for her on one occasion, out of which he paid certain taxes and gave Miss Merriss the balance; depositing money for her on two occasions, and receiving, on her behalf, some payment of money on account of a mortgage.

There is no evidence whatever in the record to show that she ever had any advice from any person (unless from Dr. Stephens) from February 16th, 1903, when she entered into partnership with him, down to the date of her death, as to such important legal matters as the formation of the copartnership, the execution of the articles of copartnership, and the giving of the note for $5,000 as security under said articles, or as to the matter of the gift here in question, or as to any other matter except her will above referred to.

(1)    The gift, if made, as testified by Dr. Stephens, was clearly a gift *causa mortis*, and as such was within the clear rule laid down

by this court in the case of *Citizens Savings Bank* v. *Mitchell*, 18 R. I. 739, where it is said: "Gifts *causa mortis* require for their support the clearest and most satisfactory proof. No doubt or suspicion should be left in the mind of the court concerning the essential facts." The gift was set aside, because the proof did not satisfy the rule.

As in the last-mentioned case, wherein a will formerly executed in pursuance of a carefully matured plan would have been almost wholly defeated if the gift were sustained, so in this case the gift was of such a large portion of the estate of Miss Merriss, being substantially all of her personal estate, and substantially all that was productive of income, that it would, if sustained, seriously interfere with the distribution of the estate under the carefully considered will executed April 11th, 1904.

Dr. Stephens stands in a very peculiar relation to this estate. Under the articles of copartnership he became possessed of a note for $5,000, which he has in suit now pending against the administrator; as physician in the last illness he has a suit pending for $1,750 for services and expenses, as a preferred claim; as legatee under the will he is entitled to a bequest of $3,000 (besides some interest in real estate); while as a beneficiary under the gift *causa mortis*, if it is sustained, he takes substantially all of the personal and productive property left by the deceased. In view of all these facts, this court is unable to say that there is "the clearest and most satisfactory proof" that Miss Merriss intended to do what it is claimed by the respondent that she has done, upon the face of the papers. We can not believe that she fully realized that by these successive transactions she had virtually given her entire estate to the respondent. If she had so fully realized and had so intended, it would have been far simpler to have made him the sole devisee and legatee under her will.

The rule stated in *Citizens Savings Bank* v. *Mitchell*, *supra*, is fully supported by the cases, cited upon the briefs of counsel in this case, relating to gifts *causa mortis*. Thus in *Lewis* v. *Merritt*, 113 N. Y. 386, the court, speaking of the case of *Grey* v. *Grey*, 47 N. Y. 552, the opinion concludes (pp.390, 391)

as follows: "When it was said in *Grey* v. *Grey* (47 N. Y. 552) that a gift *mortis causa* must be proved beyond suspicion, the meaning of the learned judge was entirely plain and ought not to be misapprehended. It was a passing remark and very briefly phrased, and obviously meant that circumstances legitimately raising a suspicion of fraud or wrong must be explained away. The same judge, in *Grymes* v. *Hone* (49 N. Y. 17), upheld such a gift, saying: 'As there is great danger of fraud in this sort of gift, courts cannot be too cautious in requiring clear proof of the transaction. This has been the rule from the early days of the civil law (which required five witnesses to such a gift) down to the present time;' and he added, as to the case before him, 'the proof of the assignment is entirely clear.' Undoubtedly in such cases the proof must be clear and convincing, and strong and satisfactory, but it is not correct to say that the presumptions of law are *against* a gift as the learned judge charged, although it is true that the law does not presume in its favor, but requires clear and convincing proof; nor was it proper to say to the jury that the fact of a gift must be proved beyond suspicion." And to the same effect, as to the general rule, see *Ellis* v. *Secor*, 31 Mich. 185, 188; *Goulding* v. *Horbury*, 85 Me. 227, 234; *Dole* v. *Lincoln*, 31 Me. 422, 433; *Delmotte* v. *Taylor*, 1 Redf. (1 N. Y. Surr.) 417, 423; and *Kenney* v. *The Public Adm'r*. 2 Brad. (N. Y. Surr.) 319, 321.

There is no doubt whatever as to this general rule, and an examination of the cases above cited shows its application to the state of facts in each case.

Counsel have also cited a great number of cases relating to gifts not *causa mortis* as between parties in confidential relations, such as attorney and client, principal and agent, physician and patient, parent and child, etc. It is not necessary to encumber this opinion with a review of these cases, but the general rule applicable to them is well stated by Sir John Romilly, Master of the Rolls, in *Hoghton* v. *Hoghton*, 15 Beav. 278, at pages 298 *et seq*, as follows:

"I am of opinion, as I lately held, in a case of *Cooke* v. *Lamotte* (a), that wherever one person obtains, by voluntary

donation, a large pecuniary benefit from another, the burthen of proving that the transaction is righteous, to use the expression of Lord *Eldon*, in *Gibson* v. *Jeyes* (*a*), falls on the person taking the benefit. But this proof is given, if it be shown that the donor knew and understood what it was that he was doing. If, however, besides the obtaining the benefit of this voluntary gift from the donor, the donor and donee were so situated towards each other, that undue influence might have been exercised by the donee over the donor, then a new consideration is added, and the question is not, to use the words of Lord *Eldon*, in *Huguenin* v. *Baseley* (*b*), ' whether the donor knew what he was doing, but how the intention was produced;' and though the donor was well aware of what he did, yet if his disposition to do it was produced by undue influence, the transaction would be set aside.

" In many cases, the court, from the relations existing between the parties to the transaction, infers the probability of such undue influence having been exerted. These are the cases of guardian and ward, of solicitor and client, spiritual instructor and pupil, medical adviser and patient, and the like; and, in such cases, the court watches the whole transaction with great jealousy, not merely for the purpose of ascertaining that the person likely to be so influenced fully understood the act he was performing, but also for the purpose of ascertaining, that his consent to perform that act was not obtained by reason of the influence possessed by the person receiving the benefit; not that the influence itself, flowing from such relations, is either blamed or discountenanced by the court; on the contrary, the due exercise of it is considered useful and advantageous to society; but this court holds, as an inseparable condition, that this influence should be exerted for the benefit of the person subject to it, and not for the advantage of the person possessing it."

Substantially the same rule has been applied in many similar cases, cited by the parties, in some of which gifts have been sustained upon ample evidence satisfying the rule, and in others gifts have been set aside, where the evidence did not satisfy the court. See *Cooke* v. *Lamotte*, 15 Beav. 234; *Hu-*

*guenin* v. *Baseley,* 14 Vesey Jr. 273; *Morley* v. *Loughnan* L. R. 1893, 1 Ch. Div. 736; *Tate* v. *Williamson,* L. R. 2 Ch. Ap. 55; *Cadwallader* v. *West,* 48 Mo. 483, 497; *Yosti* v. *Laughran,* 49 Mo. 594; *Todd* v. *Grove,* 33 Md. 188; *Woodbury* v. *Woodbury,* 141 Mass. 329; *Ralston* v. *Turpin,* 129 U. S. 663, 675, and *Mackall* v. *Mackall,* 135 U. S. 167.

We find nothing in any of the cases cited to disturb in any way the conclusions reached upon a careful consideration of the rule above set forth relating to gifts *causa mortis.*

The relations of the respondent with the deceased, as a physician, as a partner, and as a friend, are shown by the evidence to have been of the closest character, both as to matters of business and as to professional attendance, approximating, as shown by the respondent's own testimony, the relation of parent and child; and while there is not, and could not be, in the nature of the case, any direct and positive evidence of the exercise of undue influence in the technical legal sense, such exercise of undue influence being denied by the respondent, and he being the only person now living who knows just what passed between him and the deceased, yet all the circumstances detailed in the evidence and stated herein were of such a character as to have given the respondent full opportunity, if he saw fit, to exercise just such an influence as the law forbids.

In the absence of any evidence as to any change of relations or conditions between the deceased and the beneficiaries under her will, we can not account for her sudden change in the disposition of her property except upon the inference, either that the transaction was not what it appears to be on its face, or that she did not fully understand the nature and effect of her acts in relation to the disposition of her personal estate, and that the gift she attempted to make was not the intelligent expression of her intention, but was the result of the undue influence of the respondent.

The appeal is dismissed, the decree of the Superior Court is affirmed, and the case is remanded to the Superior Court for further proceedings in accordance with the decree.

*Claude J. Farnsworth and James F. Murphy*, for complainant.
*Dubois & Dubois*, for respondent.