Argued June 13; affirmed July 10, 1934

## FISCHER *v.* PETERS

(34 P. (2d) 305)

*Livy Stipp* and *Charles T. Sievers,* both of Oregon City, for appellant.

*A. G. Beattie,* of Oregon City, and *Estes Snedecor,* of Portland (Schuebel & Beattie, of Oregon City, and Estes Snedecor, of Portland, on the brief), for respondent.

BAILEY, J. This suit was instituted by Paul Fischer, administrator of the estate of Minnie Schlickeiser, deceased, against Augusta Peters, for an ac-

counting of certain moneys coming into her possession alleged to belong to the decedent's estate. As the matter comes before us it involves the accounting for one-half of approximately $3,070 received by the defendant from the joint accounts of Minnie Schlickeiser and her husband in two banks in Portland, on November 9, 1931; and, in addition, for one-half of an amount in excess of $7,000 from three certificates of deposit in a Portland bank in the joint names of Minnie Schlickeiser and her husband, alleged by defendant to have been given to her by Minnie Schlickeiser on November 14, 1931. From a judgment and decree entered in favor of the plaintiff and against the defendant for the sum of $5,432, the defendant appeals.

Mrs. Schlickeiser was born in Germany and had been in this country approximately sixty-four years at the time of her death, which occurred in the state hospital for the insane at Salem, Oregon, on January 20, 1932, seven days after she was received at that institution. In 1902 she was married to C. L. Schlickeiser, who had, by a former marriage, seven children then living, four sons and three daughters. The eldest of this family was the defendant, Augusta Peters. There was no issue of the marriage of Minnie and C. L. Schlickeiser.

Mr. and Mrs. Schlickeiser lived in the country near Wilsonville from the time of their marriage until about 1917, when they moved to Portland, where they resided until September 5, 1931, when they went to Oswego to live with Augusta Peters, who had lived there for some ten years.

At the time of their removal to Oswego C. L. Schlickeiser was approximately eighty-three years of age and his wife was eighty-two, computing her age from her certificate of registration made on July 15,

1913. Both were in failing health. Beginning as early as 1922 or 1923 Mrs. Schlickeiser's sight had been weakened by senile cataracts. One of her eyes had been removed and the sight in the other eye was impaired to a degree technically termed five-sixtieths, which was explained to denote that she could see at only five meters what the normal eye would see at sixty meters. Regardless of her failing health and impaired eyesight, Mrs. Schlickeiser had been able to do her own housework, although there is some dispute as to the cleanliness and order which she was able to maintain.

Mrs. Peters and her husband, Abbo Peters, had several children, and during the ten years that they had lived at Oswego Mrs. Peters or some of the children visited the Schlickeisers in Portland almost weekly.

A short time before September 5, 1931, at least two discussions were had between Mrs. Peters and the Schlickeisers about the advisability of their moving to her home at Oswego. Concerning those conversations, Mrs. Peters testified as follows:

"He [Mr. Schlickeiser] says, 'Augusta', he says, 'do you and Abbo want us to come out and live with you?' I said, 'I have just been wishing for you, papa, to ask that question.' Because I felt that they were getting old and should come. He said they had discussed it, and came to the conclusion, both of them, that they would have to do something. Then my stepmother says, 'If you can't take us, we are going to the old folk's home.' And papa said, 'Yes, we have decided that. Your place is the only place we can move to, and if you folks don't take us, we are going to go to the old folk's home.' Then he approached us about what we would charge for keeping them. He wanted to do something for us for keeping them.   *   *   *

"Well, they both asked what we wanted for keeping them. And we said we didn't want anything. He said they would not go with that understanding. They would do something for us  *  *  *  That evening, in bidding them goodbye, they both shook hands with me and told me to come the early part of the week, because they would start making preparations to move out at once. I went down on Tuesday and visited with them, and they had asked the same question. They asked how much our debt was on the farm. And they insisted on me telling them. And then they both said they would take care of that.  *  *  *"

On September 5, 1931, Mr. and Mrs. Schlickeiser went to live with the Peters family at Oswego. Nothing of importance here seems to have occurred during the following two months.

On November 6 Mr. Schlickeiser and Mrs. Peters went to the United States National Bank in Portland, where Mr. Schlickeiser cashed some dividends which he had recently received. While there he told a bank employee that he had moved to Oswego, and asked how he could arrange to have his daughter procure money from the bank for him, as it would be difficult for him to come to Portland every time he would want money. On advice of the bank employee, Mr. Schlickeiser signed a power of attorney authorizing his daughter, Mrs. Peters, to sign and endorse checks and drafts and transact any and all business which he might have with the bank, in his name and as his attorney.

In the evening of November 6 Mr. Schlickeiser fell and broke his hip, and was bedfast from that time until the date of his death, February 26, 1932.

After moving to Oswego, Mr. Schlickeiser had turned over to the Oswego State Bank for collection a note in excess of $2,800, secured by a farm mortgage,

and in the collection of this note Mr. Sadilek, cashier of the Oswego State Bank, had several conferences with him.

On November 9, 1931, while Mr. Schlickeiser was in bed, Mr. Sadilek came to confer with him, and Mrs. Peters was called into her father's room and was told by him to get his little satchel from under the bed. Then Mr. Schlickeiser took a key which he had in a purse under his pillow, opened the satchel, took out a tin box and opened it with the key, and took from the box two savings account books, which he handed to Mr. Sadilek. With reference to this occurrence, Mrs. Peters as a witness said:

"Mr. Sadilek said—this is when he first expressed himself again about taking care of the mortgage. I hadn't known that he was going to undertake it that morning, or any time afterwards. Then Mr. Sadilek said: 'You will have to sign slips so I can draw this.' And all the time my mother was conversing with him in German."

Then, according to the testimony of Mrs. Peters, her father requested Mr. Sadilek to "go to the Portland banks and draw the money out and take care of the mortgage for me". With further reference to this matter, Mrs. Peters thus testified:

"Q. On November ninth, you say the bank books were turned over to Mr. Sadilek?

"A. Yes, sir.

"Q. Was there anything further to that transaction?

"A. Well, daddy being very economical, he didn't like to lose the interest, and he asked Mr. Sadilek how it could be arranged to take care of that interest. And Mr. Sadilek told him to leave a little amount over in the bank until the interest was due. They had had interest many years. How to take care of that interest.

"Q. What was the occasion of those amounts being drawn out later?

"A. At his request. He knew the dates the interest was due, and he asked for the money to be drawn out."

On November 9, 1931, Mr. and Mrs. Schlickeiser had joint savings accounts of $1,952.95 in the First National Bank of Portland and $1,137.22 in the United States National Bank of Portland. On that date all of the money was withdrawn by the Oswego State Bank, on the signature of C. L. Schlickeiser alone, from both savings accounts, except $10 left in each until the next interest payment date. These small balances, with interest amounting to $19.37 and $11.38 respectively, were withdrawn from the banks on or about February 15, 1932, at the request of C. L. Schlickeiser, and were deposited on February 19, 1932, in the Oswego State Bank in his name.

At the time of the withdrawal of the larger sums from the savings accounts, Mrs. Peters and her husband were indebted to the Oswego State bank in a sum slightly less than $3,100; and the money withdrawn from the Portland banks was applied by the Oswego State Bank, together with five to ten dollars taken from the account of Mrs. Peters and her husband in the latter bank, to discharge that indebtedness.

Referring to the withdrawal of the savings accounts on November 9, Mr. Sadilek stated that on that date he called at the Peters home at Oswego, where Mr. and Mrs. Schlickeiser were then staying, and that as he recollected he had been asked to come, but did not remember who had sent for him. He further stated that Mr. Schlickeiser was in bed, that Mrs. Schlickeiser was in the room, that "they signified or someone signified an intention to want to clean up the Peters mortgage", and that "they wanted to pay off the Peters mortgage, with an idea of helping them; with the idea the money was drawing a less rate of interest.

When questioned by the court concerning Mrs. Schlickeiser's understanding of English, Mr. Sadilek answered: "I think she understood quite a little. I think she understood quite a little, but the amount she could talk back, I imagine, from the little dealings we had, I can say slightly. I don't know as I ever heard talk outside of 'Yah, yah, it is all recht', or a few little words we learned that we can catch, is all."

On November 14, 1931, the Oswego State Bank, through Mr. Sadilek, collected the note above referred to, on which there was due the sum of $2,814.54, and deposited the proceeds in its suspense account without any notation showing to whom the money belonged.

In the morning of the same day, before the bank opened, Mr. Sadilek went to the Peters home and there Mr. Schlickeiser endorsed the three certificates of deposit hereinbefore mentioned, whereupon Mrs. Schlickeiser, who had been in her husband's room, went into another room and there Mr. Sadilek guided her hand in placing her signature as endorsement on the certificates. According to his story and that of Mrs. Peters, Mrs. Schlickeiser was advised that it would be to her benefit to sign the certificates. She spent considerable time in writing the first letter of her Christian name, and Mr. Sadilek, impatient to leave in order to reach the bank before it opened, took hold of her pen either above or below her hand and in a short time her name was written on all three certificates.. While he was thus assisting Mrs. Schlickeiser to sign her name, Mrs. Peters entered the room, and both Mr. Sadilek and Mrs. Peters testified that he said, as she entered, "This is legal".

Mr. Sadilek took the endorsed certificates to his bank and entered the sum thereof on deposit slips in the bank's suspense account, and the amount was so

carried on its books, without any notation either on the deposit slips or on the bank's books as to the ownership of the certificates.

In explaining the transaction Mr. Sadilek testified that Mr. Schlickeiser had, two or three days before November 14, discussed with him turning over some of his property to Mrs. Peters, and that "They said they were satisfied that Mrs. Peters would take care of them. That was discussed between them to quite a large extent. Mr. Schlickeiser said he was satisfied that Mrs. Peters would take care of Mrs. Schlickeiser if anything happened to him. * * * They told me they had faith in Mrs. Peters, that she would carry on in the event that anything happened to either of them. I may need some prompting. I do not know just what evidence is desired."

Mrs. Peters testified that when the certificates were shown to her, her father said: "Here, Augusta, here is what I have put aside for what you have done for us in the past, and for you to take care of us in the future." She further testified that, after Mr. Sadilek left: "I went in there and, carressing and kissing those poor, dear old folks, told them how much I thought of them, and that I had never expected—never knew they had that money. Papa says, 'Augusta, you have taken your mother's place; you shall have her share'."

On or about December 3, 1931, Mrs. Schlickeiser suffered what was termed a "stroke", described by her attending physician as Bell's palsy, due possibly to a cold draft. The physician testified that her subsequent mental condition was not due to that affliction. The so-called stroke, however, necessitated additional attendance and nursing of the elderly patient. About Christmas, Mrs. Schlickeiser seemed to be fast losing

her mind, and on January 6, 1932, an insanity complaint was filed against her by the son-in-law of Mr. and Mrs. Peters. At the insanity hearing on January 12 the physicians present, in filling out their certificates of examination, assigned the cause of insanity as probably shock from loss of eyesight. They stated that her mind had been gradually failing for the past year. This last conclusion was based upon the statement made and information furnished by Mrs. Peters at the time of the examination.

On December 24, 1931, a cashier's check for $2,000 was made out to C. L. Schlickeiser and charged to the suspense account. It was endorsed by Mr. Schlickeiser and above his signature were written the words, "Pay to the order of Carl E. Schlickeiser". On January 4, 1932, a cashier's check was issued to Augusta Peters for $814.54 and it was likewise charged to the suspense account. The total of these two items corresponds with the amount which the Oswego State Bank had collected for Mr. Schlickeiser on November 14, 1931, on the note and farm mortgage held by him.

This $814.54 was used to defray expenses connected with the last illness of both Mr. and Mrs. Schlickeiser and their funeral and other expenses, including $2 per day paid to the son-in-law of Mr. and Mrs. Peters for assisting in taking care of the Schlickeisers from November 20, 1931, to February 26, 1932, the date of Mr. Schlickeiser's death. After all the above items were paid there remained a balance of $27.75, which was turned over by the defendant to the administrator of Mr. Schlickeiser's estate.

When asked why she had not used some of the money realized from the certificates of deposit to care for Mrs. Schlickeiser, instead of having her sent to the insane asylum at Salem, Mrs. Peters testified that

the $814.54 was put in her checking account at the request of her father for "paying all doctor bills, funeral expenses and to take care of everything as long as he lived".

When the certificates of deposit matured, two on January 5, 1932, totaling $6,275.78, and one on February 25, 1932, for $817.57, they were presented by the Oswego State Bank to the United States National Bank of Portland for payment of principal and accrued interest, and the proceeds were thereafter carried in the suspense account of the Oswego State Bank until after the death of both Mr. and Mrs. Schlickeiser.

Mr. Sadilek defined a suspense account as something held in suspense or abeyance, or as a utility account. He explained the placing of the certificates and the money realized therefrom in the suspense account by stating that when the certificates were transferred to him by Mr. Schlickeiser he was advised by the latter to see that the proceeds thereof were invested in sound bonds, but that at that particular time there were no such bonds available.

On March 8, 1932, after both Mr. and Mrs. Schlickeiser had died, the Oswego State Bank issued to Mrs. Peters and her husband a certificate of deposit for $7,000. Later, this certificate was cashed, and at the time of the trial the defendant had a certificate of deposit in the same bank for $2,000 and had loaned practically all the balance of the $7,000 on real estate mortgages.

The foregoing statement is a chronological account of the case as presented to us, with special reference to the testimony of the two living participants in the principal transactions. There are certain other facts which should be mentioned.

The record is completely silent as to any statements by either Mr. or Mrs Schlickeiser concerning the alleged giving of their savings accounts on November 9, and their certificates of deposit on November 14, made after those dates, or statements made by either of them or in their presence following the time, in each instance, when Mr. Sadilek departed from the Peters home after receiving the savings withdrawal slips and the endorsed certificates of deposit, respectively, with the exception of the testimony of the daughter of Mr. and Mrs. Peters. That witness claimed to have been in the house at the time the certificates of deposit were signed. After testifying that she heard her grandmother say, at the time the certificates were signed, "Das ist gut", Miss Peters stated that during the evening of the same day she heard her grandmother say something about it. The incident was related by her as follows:

"A. We were in the bedroom. She was sitting there, after my father had come home from work, and they told him what my grandparents had done, and dad said, 'Oh, you shouldn't have done that', or something. Something to that effect. Grandma laughed and said that was all right. 'Das ist recht', or something like that. That is right.

"Q. She was referring to the time of the transfer and giving of these certificates to your mother?

"A. Yes, sir; they were talking about those."

The account given by this witness, however, is not borne out by the testimony of Mr. Peters, her father, as appears in the following excerpt:

"Q. Did Mrs. Schlickeiser say anything to you about those transactions, before or afterwards?

"A. Mrs. Schlickeiser?

"Q. Yes. Well, either one of them, both of them being present?

"A. No.

"Q. Did Minnie Schlickeiser?

"A. No.

"Q. Do you remember when the transfer was made?

"A. No, sir; I don't.

"Q. Do you remember the occasion?

"A. No, I don't remember the date.

"Q. Who first told you, Mr. Peters, that they had transferred these certificates to your wife?

"A. My wife did.

"Q. Where?

"A. In my—in our house.

"Q. Did any one else say anything to you about it?

"A. No."

We have the further fact that Mrs. Peters admits that she had never told any one outside of her immediate family, of these savings accounts and certificates, until after the death of both Mr. and Mrs. Schlickeiser. She further admitted as a witness that she did not know of "any other moneys or properties" that belonged to her stepmother than those that had been turned over to herself. And the evidence does not disclose that Mrs. Schlickeiser had any property other than her interest in the savings accounts and the certificates of deposit. In addition, there is the testimony of the two brothers and two sisters of Mrs. Peters that the defendant said in their presence, after her father's death, that her father, or, as some of them expressed it, her "folks", had never given her any money. In fact, Mrs. Peters was silent about the alleged gifts and the amounts involved until she was haled into court during the administration of the estate of her deceased father.

The testimony of competent physicians, including an alienist connected with the state hospital for the insane, showed that the insanity of Mrs. Schlickeiser was what is termed senile dementia, explained by the

physicians as a gradual weakening of the mentality extending over a period of years, mentioned by some authorities as from two or three to five years, and common to old age. Some of the characteristics most frequently present in senile dementia, according to the medical witnesses, are that the patient loses memory, particularly regarding recent happenings, although the more remote past may be remembered somewhat; judgment is lacking; and the patient is easily persuaded.

The record is not clear as to whether or not Mrs. Schlickeiser understood English to any appreciable extent. She appears always to have conversed with her husband in German, as well as with Mr. Peters and visitors. Although certain statements are attributed to her, there is no evidence of any use of English by her beyond a word or two mingled with her native German.

At the time when Mrs. Schlickeiser came with her husband to live at the Peters home she was almost totally blind, weak, and unquestionably unable to care for herself.

There are certain circumstances mentioned in the record which indicate that the money from the Schlickeisers' savings accounts was at most a loan to Mrs. Peters and not a gift, if ever intended to have been made available for her use. Mr. Sadilek testified that Mr. Schlickeiser "signified an intention to want to clean up the Peters mortgage" for the reason that the savings accounts were drawing less interest than was being paid on the mortgage. The record also shows that Mr. Schlickeiser was very anxious to get the interest which had already accrued on the savings and that the balances in the savings accounts were withdrawn at his request and credited to himself.

The record does not disclose any definite agreement on the part of Mrs. Peters to care for Mr. and Mrs. Schlickeiser during the remainder of their lives, as a consideration for the alleged gifts. In fact, Mrs. Peters herself testified that her father had hired her son-in-law to help in the care of himself and his wife, and that the money used to pay for that service was taken from a fund placed in defendant's account by her father on January 4, 1932. If the other funds had been given to Mrs. Peters on the consideration that she would care for her parents, it is hard to understand why she delayed paying the son-in-law for his services in that connection and actually compensated him out of the fund of $814.54. It is also difficult to understand why Mr. and Mrs. Schlickeiser would make an out-and-out gift of more than $10,000 to Mrs. Peters and in addition thereto expect to pay the expenses connected with their care in her home.

The defendant in her reply brief states that, "On November 9 and 14, 1931, at the time of the transactions complained of, everything indicated that she (Mrs. Schlickeiser) would outlive her husband". We therefore have a situation in which Mrs. Schlickeiser, who was not a blood-relative of Mrs. Peters, is alleged to have given what appears to be everything she owned to Mrs. Peters as an out-and-out gratuity, without any definite promise on the part of Mrs. Peters to care for her or maintain her in her last years.

Another fact which is of some importance is that although both Mr. and Mrs. Schlickeiser are alleged to have been very much concerned, before going to Oswego, about paying off the Peters mortgage, nothing was done by them regarding it until after Mr. Schlickeiser became bedfast.

It is not easy to understand why Mr. and Mrs. Schlickeiser would turn over to Mrs. Peters as an absolute gift without any conditions attached, a sum in excess of $10,000, at a time when both of them were facing actual need of their funds to provide for their maintenance, medical care and nursing. The record shows that the Schlickeisers were of an especially close and saving disposition, indeed penurious.

The manner in which the certificates of deposit, and later the proceeds thereof, were kept in a suspense account without any notation of their ownership or control until after the death of the Schlickeisers argues strongly against the proposition that those funds were ever intended as a gift. We have the further fact that there is no positive testimony that Mrs. Schlickeiser herself ever knew or intended that her interest in either the savings accounts or the certificates of deposit should be turned over to her stepdaughter as a gift.

In the case of *Jenkins v. Jenkins,* 66 Or. 12 (132 P. 542), with reference to the close relationship existing between brothers, and the *quantum* of proof necessary to establish that an actual gift was intended by the alleged donor, this court observed:

"A gift obtained by any person standing in a confidential relation to the donor is *prima facie* void, and the burden is thrown upon the donee to establish to the satisfaction of the court that it was the free, voluntary, unbiased act of the donor. A court of equity, on the grounds of public policy, watches such transactions with a jealous scrutiny, and to set them aside it is not necessary to aver or prove actual fraud, or that there was such a degree of infirmity or imbecility of mind in the donor as amounts to legal incapacity to make a will or execute a valid deed or contract: Todd v. Grove, 33 Md. 188."

■ Although, in the case at bar, Mrs. Schlickeiser was not a blood-relative of the defendant, there was nevertheless, due to her being the wife of defendant's father and the further fact that she was physically and mentally weakened and had placed herself in the defendant's care, a confidential relation between them, which imposed upon the defendant the burden of proving by clear, convincing and satisfactory evidence that Mrs. Schlickeiser intended to and actually did make a gift of her one-half interest in the savings accounts and certificates of deposit to her stepdaughter, Augusta Peters. This the defendant has failed to do.

The trial court saw and heard all the witnesses, observed their interest in the controversy and their manner of testifying, and found against the defendant's contention that the above sums of money were a gift to herself.

We find in 28 C. J. 681, § 86, the following:

"Gifts first asserted after the death of the donor are regarded with suspicion by the courts, and the rule requiring gifts to be established by clear and convincing evidence is especially applicable in such cases, particularly where a confidential relation existed between the parties, some of the decisions holding in such cases that the evidence must be as clear as that required to sustain a gift *causa mortis*. Mere preponderance of evidence will not suffice. The evidence must be so cogent, it has been said, as to leave no reasonable doubt in the mind of an unbiased person that the demand is a proper one."

Courts of equity do not look with favor upon claims such as are involved in this case, when they have not been asserted until the alleged donors have died and can not be called to prove or disprove the claimant's representations.

It is not necessary to pass upon numerous legal questions discussed in the briefs of the respective litigants, for the reason that we are of the opinion that the evidence in this case does not clearly and convincingly prove that any gift whatever was made or intended to be made by Mrs. Schlickeiser to the defendant, Augusta Peters.

The decree appealed from will, therefore, be affirmed.

RAND, C. J., and BELT and ROSSMAN, JJ., concur.